# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **PARAGON DATA SYSTEMS, INC.,** | |
| **Plaintiff,** | **Civil Action No. 1:20-cv-01883** |
| **v.** | **District Judge:  Dan Aaron Polster** |
| **CINTAS CORPORATION, *et al.*,** | **Magistrate Judge:  David Ruiz** |
| **Defendants.** | |

**DECLARATION OF THOMAS R. GOOTS**

I, Thomas R. Goots, hereby declare as follows:

1.     I am of counsel with the JONES DAY law firm and counsel of record for Plaintiff SAP America, Inc. (SAP) in this litigation.  I have knowledge of the matters stated in this declaration.  If called to do so, I could and would competently testify thereto.

2.     I submit this declaration in support of SAP's Motion for Civil Contempt Sanctions.

3.     On October 12, 2022, Paragon filed a complaint for a new action in the Court of Common Pleas, Cuyahoga County ("the New Complaint").  Motion to Substitute and to Enter Protective Order, attached as Tab A, at exhibit 1.

4.     In the New Complaint, Paragon added four individual defendants (all Cintas employees) that were not defendants in the Northern District of Ohio case.  Paragon also did not assert its claim under the Federal Defend Trade Secrets Act, which is the cause of action that originally allowed SAP to remove the previously filed case to the Northern District of Ohio. *See* Tab A, at exhibit 1.

5.     The New Complaint contained information derived from confidential documents that could have only been known to Paragon because of confidential information disclosed by

1

SAP, Cintas, and ACSIS pursuant to the Protective Order in this matter.

6.     On October 24, 2022, I sent a letter to Paragon's counsel stating that SAP believed that Paragon violated the Protective Order in this matter, by using confidential information to file the New Complaint.  *See* Letter, attached as Tab B.

7.     In this letter, I also noted that Wuliger & Wuliger, and McDonald Hopkins LLC, Paragon's current counsel, did not represent Paragon in this matter, and were therefore not entitled to have access to confidential information under the terms of the Protective Order.

8.     In response to my letter, Paragon's counsel did not deny that the allegations in the October 2022 complaint were derived from documents marked confidential pursuant to the Protective Order in the Northern District of Ohio.  *See* Response, attached as Tab C.

9.     In its response to my letter, Paragon took the position that any violation of the Protective Order could be addressed "simply and completely" by sealing the portions of the state court complaint predicated on confidential information produced in the Northern District of Ohio case.  *See* Tab C.

10.    On November 2, Paragon filed a motion to have the Protective Order from this matter entered in the newly filed Common Pleas case, and to seal the confidential portions of the New Complaint.  Paragon attached a redacted version of the New Complaint to its motion.  *See* Tab A.

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct to the best of my knowledge and understanding

Executed on November 15, 2022 in Cleveland Ohio

*/s/ T. Thomas Goots*

Thomas Goots

# TAB A

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| PARAGON DATA SYSTEMS, INC., | ) | CASE NO.:  CV 22 969925 |
| | ) | |
| Plaintiff, | ) | JUDGE:  MAUREEN CLANCY |
| | ) | |
| vs. | ) | |
| | ) | **MOTION TO (1) SUBSTITUTE** |
| CINTAS CORPORATION et al., | ) | **REDACTED COMPLAINT AND FILE** |
| | ) | **ORIGINAL UNDER SEAL, and (2)** |
| Defendants. | ) | **ENTER PROTECTIVE ORDER** |
| | ) | |

Now comes Plaintiff, Paragon Data Systems, Inc. ("Paragon"), by and through counsel, and for the reasons stated herein, hereby moves this Honorable Court to:

(1) substitute the redacted version of the Complaint (attached as Exhibit 1) in place of the full and original unredacted Complaint that was filed, and place the originally-filed Complaint under seal; and

(2) enter a protective order attached as Exhibit 2 that is the same as the October 20, 2020 Protective Order (with minor changes to conform to state court) issued by the U.S. District Court in the prior related action between the same parties, which was in effect during much of the document production at issue here.

On October 12, 2022, Plaintiff Paragon Data Systems, Inc. ("Paragon") filed the Complaint in this action alleging violations by Defendants of the Ohio Trade Secrets Act and Ohio's Civil Theft statute. The case is a refiling of an action that originated before this Court in 2019 (No. CV 19-911719).

{10757328: }

In the original action, the Court approved the parties' stipulated protective order, which allowed them to designate documents produced in discovery as attorneys' eyes only. On August 2, 2020, however, this Court issued a Journal Entry finding that Defendants Cintas Corporation ("Cintas"), SAP America, Inc. ("SAP"), and ACSIS, Inc. ("ACSIS") "[did] not appear to have completed the 'Confidential – Attorneys' Eyes Only' designation … in good faith," and that "some of the documents designated as 'Attorneys' Eyes Only' should not have been designated as sensitive at all." The Court then directed Defendants to "reconsider the designations of their document production," but the order was mooted when the case was removed to the U.S. District Court for the Northern District of Ohio in 2020 (No. 1:20-CV-1883) prior to the deadline imposed.

After removal, the District Court entered a new protective order without an attorney's eyes only designation. Despite this Court's prior admonishment of Defendants for over-designating non-confidential documents, the vast majority of the documents produced by Defendants thereafter were still designated as "Confidential," regardless of their nature or content. The federal action was dismissed without prejudice on October 13, 2021, subject to refiling the case within a year.

Paragon filed this action on October 12, 2022. On October 24, 2022, counsel for Defendant SAP wrote to the undersigned and alleged that a few paragraphs in the newly-filed Complaint may contain information derived from confidential information produced in discovery. While the parties disagree whether Defendants had properly designated purported "confidential" documents and dispute whether confidential information is disclosed in the Complaint, none of the exhibits attached to the Complaint had been so designated, nor does the new Complaint contain language quoted from any purportedly confidential document. Nevertheless, while Paragon doesn't agree with SAP's position on those few allegations, to resolve this dispute efficiently, Paragon moves to substitute a redacted version of the Complaint (attached hereto as Exhibit 1) in the place of the full

unredacted version and place the originally filed Complaint under seal. The redacted portions are those cited by counsel for SAP in his October 24 letter.

Paragon also moves to enter a new protective order (attached as Exhibit 2) that is the same as the October 20, 2020 Protective Order issued by the U.S. District Court (with minor changes to conform to state court) in the prior related case between the parties, which was in effect during much of the document productions that will be part of this action.

Respectfully submitted,

Dated:   November 2, 2022

  s/ Matthew J. Cavanagh
David B. Cupar (0071622)
Matthew J. Cavanagh (0079522)
McDonald Hopkins LLC
600 Superior Ave., East, Ste. 2100
Cleveland, Ohio 44114
t 216.348.5400 │ f 216.348.5474
dcupar@mcdonaldhopkins.com
mcavanagh@mcdonaldhopkins.com

and

  /s/ Amy A. Wuliger
Amy A. Wuliger (0091420)
Wuliger & Wuliger
2003 St. Claire Ave.,
Cleveland, Ohio 44114
t 216.781.7777 │ f 216.781.0621

*Counsel for Plaintiff*

# Exhibit
# 1

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| PARAGON DATA SYSTEMS, INC. | ) | CASE NO.: |
| 2003 St. Clair Avenue | ) | |
| Cleveland, Ohio 44114 | ) | JUDGE: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT FOR MONEY DAMAGES** |
| | ) | |
| CINTAS CORPORATION | ) | **JURY DEMAND ENDORSED HEREON** |
| c/o Corporation Service Company | ) | |
| 3366 Riverside Drive | ) | |
| Suite 103 | ) | |
| Upper Arlington, Ohio 43221 | ) | |
| | ) | |
| Serve also at: | ) | |
| 6800 Cintas Blvd. | ) | |
| P.O. Box 625737 | ) | **REDACTED VERSION** |
| Cincinnati, OH 45262 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SAP AMERICA, INC. | ) | |
| c/o The Corporation Trust Company | ) | |
| 1209 Orange St. | ) | |
| Wilmington, DE 19801 | ) | |
| | ) | |
| Serve also at: | ) | |
| 3999 West Chester Pike | ) | |
| Newton Square, PA 19073 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ACSIS INC. | ) | |
| c/o Corporation Service Company | ) | |
| 251 Little Falls Drive Wilmington, DE 1980 | ) | |
| | ) | |
| Serve also at: | ) | |
| 50 Lake Center, Executive Pkwy, Suite 201 | ) | |
| Marlton, NJ 08053 | ) | |
| | ) | |
| and | ) | |

- 1 -

GARY TICE )
8153 Jordan Valley Court )
Cleves, OH 45002 )
 )
and )
 )
WADE WILLIAMS )
5750 McNeven Court )
Dublin, OH 43017 )
 )
and )
 )
GREG BOVA )
7597 Herrick Park Drive )
Hudson, OH 44236 )
 )
and )
 )
BEN SCHNEIDER )
215 Mulberry Court )
Fort Thomas, KY 41071 )
 )
    Defendants. )

Plaintiff Paragon Data Systems, Inc. ("Paragon" or Plaintiff), by and through its undersigned attorneys, states as follows:

## PRELIMINARY STATEMENT OF THE CASE

1. This case is classic David and Goliath tale. In what should have been hailed as a victory for a small Cleveland company, Paragon Data Solutions, Inc. ("Paragon") solved a seemingly insurmountable problem for the multinational Cintas Corporation ("Cintas") that the behemoth SAP America, Inc. ("SAP") couldn't – it developed a software and hardware solution to track and share Cintas' garments across its multiple locations automatically instead of manually. Paragon called its innovation the Paragon Clearview System.

- 2 -

2. Instead of rewarding Paragon for its accomplishment and expanding use of the Clearview System company-wide, however, Cintas secretly conspired with Defendants SAP and ACSIS Inc. ("ACSIS") to surreptitiously access Paragon's technology and make their own version of it. Once they gained access to Paragon's trade secret solutions, SAP and ACSIS were finally able to do what SAP couldn't do alone. These Defendants were rewarded for their misappropriation via millions of dollars in profits derived from Paragon's innovative hard work, without having to pay Paragon a dime.

3. Paragon's Clearview System included numerous trade secrets that Defendants' intentionally misappropriated, despite Cintas's written agreement to maintain the confidentiality of Paragon's technology and not attempt to reverse engineer it.

4. ███████████████████████████████    ████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ Through their unlawful access to Paragon's trade secrets, those Defendants were able to develop their own version of Paragon's Clearview software system for Cintas to great financial advantage. In fact, ACSIS has since even marketed the stolen technology to additional customers.

5. The wrongful actions of the Defendants, as described herein, constitute trade secret misappropriation, breach of contract, fraudulent inducement, unjust enrichment, civil theft, and civil conspiracy.

**PARTIES**

6. Plaintiff Paragon Data Systems, Inc. is an Ohio corporation with its place of business located at the address in the above caption. Paragon has been, at all relevant times,

- 3 -

engaged in the business of integration of software solutions for companies with data collection requirements.

7.     Defendant Cintas Corporation is a State of Washington corporation with its principal place of business and headquarters in Cincinnati, Ohio. Cintas has been, at all relevant times, engaged in the business of supplying rentable corporate identity uniforms and related items.

8.     Defendant SAP America, Inc. is a Delaware corporation whose principal place of business is 3999 West Chester Pike, New Town Square, PA 19073. SAP is and was, at all times relevant, engaged in the business of designing and implementing ERP (Enterprise Resource Planning) software and related technology solutions to Cintas at its Ohio headquarters, as well as other branch office locations in Ohio and elsewhere.

9.     Defendant ACSIS Inc. is a Delaware corporation whose principal place of business is 50 Lake Center, Executive Parkway, Suite 201, Marlton, NJ 08053. ACSIS is and was, at all times relevant, engaged in the business of designing and implementing software and technology solutions for, *inter alia,* Cintas at its Ohio headquarters, as well as other branch office locations in Ohio and elsewhere.

10.     Defendant Gary Tice is and was, at all times relevant, an employee of Cintas whose acts and omissions in the state of Ohio give rise to causes of action stated herein. Tice worked directly and very closely with SAP employees in a division entitled "Cintas's Rental Division – SAP."

11.     Defendant Wade Williams is and was, at all times relevant, an employee of Cintas whose acts and omissions in the state of Ohio give rise to causes of action stated herein.

- 4 -

12.     Defendant Greg Bova is and was, at all times relevant, an employee of Cintas whose acts and omissions in the state of Ohio give rise to causes of action stated herein.

13.     Defendant Ben Schneider is and was, at all times relevant, an employee of Cintas whose acts and omissions in the state of Ohio give rise to causes of action stated herein.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action because Paragon's claims arose in the state of Ohio, under the laws of the State of Ohio, and Defendants Cintas, Tice, Williams, and Bova are residents of Ohio.

15.     Venue is proper in Cuyahoga County, Ohio because the agreements between Defendant Cintas and the Plaintiff from which Plaintiff's claims arise expressly provide that any suit relating thereto be instituted in Cuyahoga County, Ohio.

## FACTUAL BACKGROUND

A.     ***SAP, one of the largest software companies in the world, couldn't create an automated garment inventory solution for Cintas.***

16.     Prior to its relationship with Paragon, Cintas utilized a manual inventory and stock room process to manage and track uniforms provided to and picked up from its many customers. That manual system was cumbersome, and Cintas wasted a lot of money tracking its uniforms. Cintas wanted an automated solution for its costly problem.

17.     ████████████████████████████████████████████████████ ██████████████████████████████.

18.     SAP is known for its large, enterprise ERP business system that helps companies run their businesses. SAP generates significant revenue for its enterprise system that is meant to be installed with only minor changes to adapt the system to its customers.

- 5 -

19.     Oftentimes, however, SAP does not create client-specific solutions or modules for its enterprise system and other third-party software companies are instead engaged to create modules to incorporate into SAP's system.

20.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**B.      *Paragon, a local Cleveland software company specializing in developing unique software solutions for clients, creates an automated garment inventory solution for Cintas known as Paragon's Clearview System.***

21.     Prior to 2009, Cintas's stockroom was managed through a manual ledger by recoding its available/unallocated rentable uniform items with various colored paper hanging tags affixed with clothespins. As hanging tags often become detached from the garment resulting in lack of identifiability, this cumbersome, manual system was unreliable, and caused Cintas to purchase excess products (e.g., shirts, pants, etc.) at significant cost.

22.     In 2009, Cintas began negotiating with Paragon to provide stockroom asset visibility. They entered into a Non-Disclosure Agreement ("NDA") on September 28, 2009, attached as Exhibit 1, and Paragon began developing an automated rental uniform asset inventory and stock room process for Cintas – a one-of-a-kind solution.

23.     Among other things, the NDA required Cintas to limit disclosure or access to Paragon's "Confidential Information", as defined therein, to only those employees who were directly involved in the inventory management system being developed by Paragon and who were also bound to preserve the confidentiality of the information, "and even then only to such extent as is necessary and essential to consider and/or complete the work involved."

24.     Paragon, using its own money and resources over the next at least 19 months, learned Cintas's clunky manual system inside and out to develop a state-of-the-art confidential and proprietary solution known as the Paragon Clearview System. The Paragon Clearview System included software working with hardware, namely specific barcode scanning equipment, that allowed Cintas to share garment inventories between its various sites.

25.     The Paragon Clearview System solved Cintas's manual system issues, such as reducing redundant purchases at each location.

26.     Cintas ran Paragon's Clearview System as a test program at initial test sites, and it was successful.

**C.     Cintas agrees to the 2011 License Agreement with Paragon to use Paragon's Clearview System and Paragon's Trade Secrets.**

27.     As a result of Paragon's hard work, significant investment and the successful initial testing, Paragon obtained a three-year software licensing agreement with Cintas entitled "PDS Clearview Stockroom Visibility Software System, Master Services and License Agreement" (the "2011 License Agreement"), attached as Exhibit 2 (without schedules).

28.     In the 2011 License Agreement, Paragon gave a limited license to Cintas for its Paragon Clearview System.

29.     In return, Cintas agreed that Paragon's Clearview System: (a) includes trade secrets, (b) is confidential, and (c) shall be maintained by Cintas in that manner. Cintas also agreed that it would _not_ reverse engineer Paragon's Clearview System.

30.     The 2011 License Agreement initially extended Paragon's Clearview System to 12 business locations ("Sites") but was so successful that it expanded to include an additional 33 "New Sites" between 2011 and 2014.

31.    Paragon's Clearview System was a major success for Cintas. Between 2011 and 2014, Paragon's Clearview System helped Cintas reduce redundant purchases and improve efficiency, increasing net profits by at least $27 million.

**D.    *Based on the success of Paragon's Clearview System,***
       ***Cintas enters into a second, 2014 License Agreement with Paragon.***

32.    Based on the incredible success of Paragon's Clearview System, Cintas and Paragon entered into a new three-year license agreement on May 1, 2014, also entitled "PDS Clearview Stockroom Visibility Software System, Master Services and License Agreement" (the "2014 License Agreement"), attached as Exhibit 3 (without Schedules).

33.    The 2014 License Agreement increased the Annual Maintenance Fee for each of the Cintas Sites covered by the 2011 License Agreement.

34.    While the 2014 License Agreement contemplated the addition of 35 New Sites, Cintas didn't add new sites prior to its expiration.

**E.    *Paragon's Clearview System includes numerous trade***
       ***secrets that Cintas agreed to maintain as confidential.***

35.    Cintas agreed and acknowledged that Paragon owns all of the trade secret software, user interfaces, processes, and know-how under the Paragon's Clearview System (defined in the 2011 and 2014 License Agreements as "Paragon Technology"):

> . . . (iii) the Software, including its underlying technology, software, object and source code, processes, methods, algorithms, user interfaces, know-how and other trade secrets, techniques, designs, discoveries, inventions, structure, features, components, and other tangible or intangible technical material or information; and (iv) the work product, and any other work of authorship or invention conceived of, developed, or created by Paragon relating to the Software (collectively, the "Paragon Technology") and any improvements, derivative works, or other modifications to the Paragon Technology, including those made in response to customer specifications or a Change Request (defined below), is and shall continue to be owned by Paragon."

- 8 -

(Exs. 2-3, 2011 and 2014 License Agreements, Art. II, Sec. 2.)

36. To protect Paragon's trade secret intellectual property rights, Cintas agreed not to use Paragon's Clearview System for any other purpose:

> Under no circumstances may Customer, without prior written permission from Paragon . . . (ii) directly or indirectly provide access to the Paragon Technology to a third party; (iii) copy or permit a third party to copy the Paragon Technology; or (iv) duplicate, examine, adapt, merge, embed, decompile, disassemble, "un-lock", reverse engineer, or create a derivative work from any of the Paragon Technology.

(Exs. 2-3, 2011 and 2014 License Agreements, "Paragon Technology" at Art. III, Sec. 2.)

37. Paragon also provided Cintas physical barcoding-related equipment that included Paragon's proprietary software to operate Paragon's Clearview System at specific business locations identified the 2011 and 2014 License Agreements.

38. Schedule B to both the 2011 and 2014 License Agreements also identified the products and services under the "Paragon Technology" that was further part of the trade secret Paragon Clearview System.

39. Because Cintas knew the sensitivity of the trade secrets in Paragon's Clearview System, Cintas agreed that if it breached either the 2011 or 2014 License Agreements, it would pay the reasonable attorneys' fees of Paragon if Paragon prevailed in any action brought by it to enforce the terms. (Exs. 2-3, 2011 and 2014 License Agreements, Art. XIV, Sec. 4.)

40. Paragon's Clearview System includes valuable trade secret software, processes, methods, and know-how to which Cintas had confidential access under the 2011 and 2014 License Agreements.

41. Paragon's Clearview System is password-protected, and Paragon authorized only a few key Cintas employees to have login and password credentials to have accessibility under the

limited rights set forth in the 2011 and 2014 License Agreements. Those included Tice, Williams, Bova, and Schneider.

42.     Paragon's Clearview System includes trade secrets for its custom-designed, secure, cloud-based system (including web-based servers, database, and website) for tracking stockroom garments across multiple locations, including local systems that communicate with a central server, that function independently, and that operate via a wireless network.

43.     Paragon's Clearview System includes trade secrets for its custom-designed Garment Request Form ("GRF") and custom logic and integrated business rules for the GRF's.

44.     Paragon's Clearview System includes trade secrets for its functionality for automated and accurate query formation and garment matching, with prioritization for certain local and regional requests and unique customer garment features.

45.     Paragon's Clearview System includes trade secrets for incorporating parameter-driven, staged data feeds from its central database to its local pulling terminals with custom-designed user interfaces and software.

46.     Paragon's Clearview System includes trade secrets for custom-designed, metric-based automated analysis and reporting of stockroom activities, including tracking of grading and pulling activities & garment pulling percentages.

47.     Paragon's Clearview System includes trade secrets for automated replacement emblem/patch matching for garments.

48.     Paragon's Clearview System includes trade secrets for custom-designed, automated, weighted-average scoring system which matches garments to GRFs, including acceptable substitutions or exact required garment matching.

49.     Paragon's Clearview System includes trade secrets for custom-designed, secure, password-protected system for pulling designated garments and prioritizing existing local inventory.

50.     Paragon's Clearview System includes trade secrets for custom-designed, automated system for pulling and staging designated garments by loading local pulling terminals with instructions.

51.     Paragon's Clearview System includes trade secrets for custom-designed, grading system that generates a unique, proprietary serial number for tags.

52.     Paragon's Clearview System includes trade secrets for custom-designed benchmark tracking and integrated warning system that tracks variances from prescribed benchmarks and automatically generates stockroom and route alerts.

53.     Paragon's Clearview System includes trade secrets for its custom-designed "temporary barcode tag" system with logic automatically generating and processing transfer tags for use in sending or receiving garments from other locations.

54.     Paragon's Clearview System includes trade secrets for custom-designed user-interfaces for grading and pulling garments with corresponding database tables and logic for filling GRFs automatically, accurately, and timely.

55.     Paragon's Clearview System includes trade secrets for custom-selected, proprietary compilation of appropriate hardware used for its grading and pulling systems, with custom-designed configuration files to enable each device to operate fully with the Clearview systems, maximizing automation, accuracy and timeliness.

56.     Paragon's Clearview System includes trade secrets for its custom-designed, proprietary part numbering system that confidentially identifies and tracks parts and vendors.

57.     Paragon's Clearview System includes trade secrets for its custom-designed garment sharing system, which permits the re-utilization of used garments across different local and regional locations in order to maximize availability of garments to fulfill GRFs and to minimize duplicative or unnecessary purchases of new garments.

58.     Paragon defines the trade secrets set forth in Paragraphs 40-57 as "Paragon's Clearview Trade Secrets."

59.     Prior to this Complaint, Cintas knew the trade secret nature of Paragon's Clearview Trade Secrets. For example, Cintas agreed and acknowledged in both the 2011 and 2014 License Agreements that Paragon owns the trade secrets for the Paragon Technology.

60.     Cintas had an obligation to maintain these trade secrets confidential under the 2011 and 2014 License Agreements.

61.     Cintas also agreed not to reverse engineer these trade secrets under the 2011 and 2014 License Agreements.

**F.     *Cintas terminates the 2014 License Agreement but refuses to uninstall Paragon's Clearview System, forcing Paragon to remotely uninstall it.***

62.     In 2016, Cintas informed Paragon that it would not enter into another Master Services and License Agreement after the expiration of the 2014 License Agreement. Thereafter, one or more of Cintas's Sites failed to make payments as required under the 2014 License Agreement.

63.     In early 2017, Cintas's Wichita facility (Site # 451) violated the 2014 License Agreement by purchasing more than 75,000 grading tags from someone other than Paragon,

- 12 -

diverting revenue from Paragon in breach of the 2014 License Agreement.

64.     Following termination of the 2014 License Agreement on May 1, 2017, Cintas refused to "promptly uninstall all Software and other Paragon Technology" as required, and instead continued to use Paragon's Clearview System, without a license.

65.     Cintas's refusal to uninstall Paragon's Clearview System caused significant concern to Paragon. On June 8, 2017, Paragon remotely blocked Cintas's access to Paragon's Clearview System.

**G.      Without the knowledge of Paragon, Cintas gave access to SAP and ACSIS to Paragon's Clearview System to create a competing version of it.**

66.

67.

68.

69.



70.     At the time it entered into the 2014 License Agreement, Cintas had no intention of abiding by its terms and entered into the new agreement solely for purposes of providing SAP with unauthorized access to the Paragon Technology, i.e., the proprietary Clearview System.

71.     Thereafter and as described further below, Cintas began surreptitiously sharing the Paragon Technology with SAP to aid in its development of a software system to replace the Clearview System.

72.     ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

73.     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

74.     After the hiring of ACSIS and as described further below, Cintas and/or SAP expanded their unauthorized sharing of the Paragon Technology to include ACSIS.

75.     SAP is a very large software company. SAP owns numerous trade secret software systems as trade secrets. SAP believes it is unlawful for anyone to gain access without SAP's permission to its trade secret software systems for the purpose of reverse engineering it. SAP has enforced its intellectual property rights against third parties to stop such unlawful activities.

76.     Likewise, ACSIS is a software company that owns numerous trade secret software systems as trade secrets. ACSIS believes it is unlawful for anyone to gain access without ACSIS's permission to its trade secret software systems for the purpose of reverse engineering it.

77.     Neither SAP nor ACSIS had any relationship with Paragon.

78.     SAP did not have any right from Paragon to access Paragon's Clearview System.

79.     ACSIS did not have any right from Paragon to access Paragon's Clearview System.

- 14 -

80. Cintas, however, did have rights to access Paragon's Clearview System on a limited basis under the 2011 and 2014 License Agreements.

81. Cintas did not seek authorization from Paragon, and Paragon never authorized Cintas, to show the trade secrets in the Paragon Clearview System to any third party. Further, Cintas never sought permission from Paragon, and Paragon never authorized (nor would it have ever authorized) Cintas to share its proprietary technology with SAP or ACSIS who intended to create their own version of Paragon's Clearview System upon learning Paragon's trade secrets.

82. Servicing a large account such as Cintas for millions of dollars proved too irresistible to SAP and ACSIS. Unfortunately to get to the same solutions that Paragon already successfully reached, SAP and ACSIS performed the very unlawful acts here that they believe are unlawful when other companies perform such acts on them: obtaining access to Paragon's trade secrets in the Clearview System through Cintas and Cintas employees to reverse engineer it, create their own version of it, and make a lot of money on its version having the functionalities found in Paragon's Clearview System.

**H.** *Cintas and Tice, Williams, Bova, and/or Schneider shared login and password information to Paragon's Clearview System to allow SAP and ACSIS to replicate it.*

83. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████

84. ██████████████████████████████████████████
█████████████████████

85.    As described in Schedule B to the 2011 and 2014 Licensing Agreements, Paragon's Clearview System was designed with three different tiers of authorized user defining the scope of each user's access to the Clearview website: Base User, Super User, and Admin.

86.    Base Users were only authorized to access certain files and data for their specific, pre-determined sites and to update their own personal account details.

87.    Super Users were authorized to access all the functions of a Base User but could also manage (add, delete, edit, migrate and unlock) other user accounts.

88.    Admin users were authorized to access all the functions of a Super User as well as the ability to manage reports that are displayed.

89.    Paragon issued unique login credentials for each authorized user at Cintas for Paragon's Clearview System. Under the 2011 and 2014 License Agreement, Cintas was not allowed to provide access to any third party any trade secret or confidential information to the Paragon Technology, which included Paragon's Trade Secrets. Cintas employees who were authorized users and given unique login credentials to Paragon's Clearview System were not allowed to share them with others.

90.    Defendants Williams, Schneider, and Bova were Admin users with access to Paragon's Clearview System-wide reports. Defendant Tice was a Base User with only limited access to Paragon's Clearview System.

91.    ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

92. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

93. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████  ███████

94. ████████████████████████████████████████████
████████████████████  ████  █████████████████████
███████████████████

## I.  *SAP and ACSIS's replicated version of Paragon's Clearview System includes Paragon's Trade Secrets.*

95.    Having gained access to Paragon's Clearview System without Paragon's knowledge through Cintas, Williams, Schneider, Bova, and Tice, SAP and ACSIS developed their own version of a hardware and software system that had many of the same unique, trade secret capabilities that Paragon created as Paragon Trade Secrets for Paragon's Clearview System.

96.    For example, the following table provides a non-exhaustive list showing some of the unique, trade secret features Paragon developed in the Paragon Clearview System by 2011 and SAP/ACSIS's version having the identical or nearly identical functions:

| Paragon's Clearview System Functionality | ACSIS/SAP Misappropriation of Paragon's Trade Secret Functionality |
|---|---|
| Paragon's Clearview System is a secure, cloud-based system (including web-based servers, database, and website) for tracking stockroom garments across multiple locations, including local systems that communicate with a central server, that function independently, and that operate via a wireless network. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System includes a custom-designed Garment Request Form ("GRF") and custom logic and integrated business rules for the GRF's. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System includes automated and accurate query formation and garment matching, with prioritization for certain local and regional requests and unique customer garment features. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System incorporates parameter-driven, staged data feeds from its central database to its local pulling terminals with custom-designed user interfaces and software. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System uses custom-designed, metric-based automated analysis and reporting of stockroom activities, including tracking of grading and pulling activities & garment pulling percentages. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System includes automated replacement emblem/patch matching for garments. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |

| Paragon's Clearview System Functionality | ACSIS/SAP Misappropriation of Paragon's Trade Secret Functionality |
|---|---|
| Paragon's Clearview System includes custom-designed, automated, weighted-average scoring system which matches garments to GRFs, including acceptable substitutions or exact required garment matching. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System includes custom-designed, secure, password-protected system for pulling designated garments and prioritizing existing local inventory. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System includes custom-designed, automated system for pulling and staging designated garments by loading local pulling terminals with instructions. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System includes custom-designed, grading system that generates a unique, proprietary serial number for tags. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System includes custom-designed benchmark tracking and integrated warning system that tracks variances from prescribed benchmarks and automatically generates stockroom and route alerts. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System includes custom-designed "temporary barcode tag" system with logic automatically generating and processing transfer tags for use in sending or receiving garments from other locations. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |

| Paragon's Clearview System Functionality | ACSIS/SAP Misappropriation of Paragon's Trade Secret Functionality |
|---|---|
| Paragon's Clearview System includes custom-designed user-interfaces for grading and pulling garments with corresponding database tables and logic for filling GRFs automatically, accurately, and timely. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System includes custom-selected, proprietary compilation of appropriate hardware used for its grading and pulling systems, with custom-designed configuration files to enable each device to operate fully with the Clearview systems, maximizing automation, accuracy and timeliness. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System includes custom-designed, proprietary part numbering system that confidentially identifies and tracks parts and vendors. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |
| Paragon's Clearview System is a custom-designed garment sharing system, which permits the re-utilization of used garments across different local and regional locations in order to maximize availability of garments to fulfill GRFs and to minimize duplicative or unnecessary purchases of new garments. | Yes, ACSIS/SAP wrongfully accessed and used Paragon's trade secret without Paragon's permission to replicate this functionality, and continue to do so. |

**J.** *Cintas, SAP and ACSIS secretly parallel tested the capabilities of its replicated version to Paragon's Clearview System without Paragon's knowledge.*

97. ████████████████████████████████████████████████

████████████   ████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████

98.    The parallel testing further shows how Cintas refused to follow the limited use rights it had to the Paragon Technology under the Agreement and explicitly violate those terms, including confidentiality and no reverse engineering.

**K.** *Cintas replaces Paragon with SAP and ACSIS and their replicated version of Paragon's Clearview System.*

99.    Having access to Paragon's Clearview System through Cintas and Tice, Williams, Bova, and Schneider, and developing their own version of it, SAP and ACSIS replaced Paragon as the supplier to Cintas of an automated uniform inventory management and stock room process after SAP and ACSIS were provided access to the "Paragon Technology."

100.    SAP did develop an automated solution to electronically maintain Cintas's garment inventory after April 2015. Cintas continues to pay SAP for that automated solution which was developed by accessing Paragon's Clearview System.

101.    ACSIS did develop an automated solution to electronically maintain Cintas's garment inventory after April 2015. Cintas paid ACSIS for developing that automated solution which was developed by accessing Paragon's Clearview System.

**L.     *ACSIS continues to sell to other customers the same, replicated software based on its access to the trade secrets in Paragon's Clearview System.***

102.     Since ACSIS obtained access to the trade secrets in Paragon's Clearview System to develop its own version that includes Paragon's trade secrets, ACSIS has been touting to potential customers that it can provide those same solutions.

103.     On its website, ACSIS touts these solutions it misappropriated from Paragon as shown below.





*M.*     *The procedural history of prior litigation between the parties helps*
        *establish the facts and legal claims against the Defendants for this Suit.*

104.     On February 26, 2019, Paragon filed an action in the Cuyahoga Common Pleas Court against Defendant Cintas and fictitious defendants John Does 1 through 5 and ABC Company, alleging breach of contract, breach of covenant of good faith and fair dealing, and unjust enrichment (the "First Action").

105.     The complaint in the First Action was later amended to include Defendants SAP and ACSIS, as well as additional causes of action, and was subsequently removed to the U.S. District Court.

106.     On October 13, 2021, the U.S. District Court dismissed the First Action without prejudice pursuant to Fed.Civ.R. 41(a)(2), ordering that the case could be refiled within one year by October 13, 2022. This complaint has been refiled within that one-year period but is not subject to federal jurisdiction because there are no federal questions in it and there is no diversity since Paragon and Cintas are Ohio companies and Tice, Williams, and Bova are Ohio residents.

107.     Through discovery conducted during the pendency of the First Action, Paragon learned that prior to termination of the 2014 License Agreement, Defendants Tice, Williams, Bova, and Schneider engaged in unauthorized password sharing in a deliberate effort to defraud Paragon and misappropriate the Paragon Technology in violation of ORC §§ 2913.04 and 2913.49.

## COUNT I – Ohio Trade Secrets Act Violation
### (Cintas, SAP, and ACSIS)

108.     Plaintiff incorporates by reference the allegations contained in the above paragraphs as if set forth fully herein.

109.    Ohio has adopted the Uniform Trade Secret Act, ORC §§ 1333.61-69, which prohibits the misappropriation of the Trade Secrets of another.

110.    Defendant Cintas was aware, through its contractual agreements with Paragon, that the Paragon Technology were Paragon's Trade Secrets, and agreed not to disclose the same to third- parties without the prior express written consent of Paragon.

111.    Upon information and belief, Defendant SAP and Defendant ACSIS knew or had reason to know that Paragon's Trade Secrets, which they used for the benefit of Cintas and themselves, was acquired by Cintas under circumstances giving rise to a duty to maintain its secrecy or limit its use.

112.    The Defendants misappropriated Paragon's Trade Secrets without the prior express written permission of Paragon for the Defendants' collective efforts to design and implement software and technology solutions for Cintas at its Cincinnati, Ohio headquarters, and other branch offices, replacing the Paragon Technology.

113.    As a direct and proximate result of the misappropriation, Defendants were able to develop a similar product to the Paragon Technology, in a shortened amount of time and at less cost, by utilizing Paragon's Trade Secrets.

114.    As a direct and proximate result of the complained of conduct, Paragon lost profits and sustained damages, while Defendants made profits, and enjoyed saving the cost of research, design, and implementation resources to achieve the system built to replace the Paragon Technology, and otherwise.

115.    Plaintiff is entitled to damages for the complained of conduct in an amount in excess of $25,000.00 for lost profits, disgorgement of profits and/or savings enjoyed by

Defendants, and such further and additional damages, including multiple damages and reasonable attorneys' fees, litigation costs, court costs and a reasonable royalty, as will be demonstrated at trial.

### COUNT II – Breach of Contract
### (Cintas)

116.    Plaintiff incorporates by reference the allegations contained in the above paragraphs as if set forth fully herein.

117.    Paragon and Cintas entered into a valid agreement for the provision of products and services in exchange for monetary compensation.

118.    Paragon substantially performed its obligations under the 2014 License Agreement.

119.    Defendant Cintas breached the 2014 License Agreement by (a) failing to maintain the confidentiality of the Paragon Technology; (b) underpaying the amount owed thereunder, without legal excuse; (c) purchasing products from third-parties when it was contractually required to purchase exclusively from Paragon; and (d) utilizing the Paragon Technology without authorization after the 2014 License Agreement was terminated/expired.

120.    As a direct result of Defendant Cintas's breaches of the 2014 License Agreement, Plaintiff has suffered damages in an amount as-yet undetermined but in excess of $25,000.

### COUNT III – Fraudulent Inducement
### (Cintas)

121.    Plaintiff incorporates by reference the allegations contained in the above paragraphs as if set forth fully herein.

122.    By executing the 2014 License Agreement, Cintas represented that it would not provide access to the Paragon Technology to a third party without the express written consent of

Paragon, and that it would promptly inform Paragon of any unauthorized use of the Paragon Technology that it became aware of during the term of the Agreement. Paragon justifiably relied on Cintas's representations that it would abide by the 2014 License Agreement, including but not limited to its confidentiality provisions.

123.    At the time it entered into the 2014 License Agreement, however, Cintas had no intention of honoring the confidentiality provisions contained therein, and instead entered into the 2014 License Agreement solely to maintain its access to the Paragon Technology for purposes of surreptitiously facilitating SAP's and/or ACSIS's replication of Paragon's Clearview System.

124.    At the time Cintas entered into the 2014 License Agreement, it was already engaged in discussions with SAP and/or ACSIS to replace Paragon's Clearview System with a replicated system to be developed using technology misappropriated from Paragon.

125.    Cintas induced Paragon to enter into the 2014 License Agreement by fraudulently concealing its intent to misappropriate the Paragon Technology and/or its discussions with SAP and/or ACSIS to provide a replacement for Paragon's Clearview System.

126.    As a result of Defendant Cintas's fraudulent inducement, Plaintiff has suffered damages in an amount as-yet undetermined but in excess of $25,000.

## COUNT IV – Unjust Enrichment
### (Cintas – *Pled in the Alternative to Breach of the 2014 License Agreement*)

127.    Plaintiff incorporates by reference the allegations contained in the above paragraphs as if set forth fully herein.

128.    Defendant Cintas's use of the Paragon Technology (Clearview System) resulted in its receipt of a benefit for which it has not fully paid Plaintiff, despite Plaintiff's demand for same.

129.     Defendants Cintas's knowing and intentional misappropriation of the Paragon Technology resulted in its receipt of a benefit for which it has not paid Plaintiff, despite Plaintiff's demand for same.

130.     Under the circumstances, Defendant Cintas received a benefit in an amount as-yet undetermined but in excess of $25,000 for which Plaintiff should be compensated to avoid unjust enrichment to Defendant.

## COUNT V – Unjust Enrichment
### (Cintas – *Post-Termination of the 2014 License Agreement*)

131.     Plaintiff incorporates by reference the allegations contained in the above paragraphs as if set forth fully herein.

132.     Defendant Cintas's use of the Paragon Technology (Clearview System) after termination of the 2014 License Agreement resulted in its receipt of a benefit for which it has not paid Plaintiff, despite Plaintiff's demand for same.

133.     Under the circumstances, Defendant received a benefit in an amount as-yet undetermined but in excess of $25,000 for which Plaintiff should be compensated to avoid unjust enrichment to Defendant.

## COUNT VI – Unjust Enrichment
### (SAP and ACSIS)

134.     Plaintiff incorporates by reference the allegations contained in the above paragraphs as if set forth fully herein.

135.     Defendants SAP's and ACSIS's knowing and intentional misappropriation of the Paragon Technology resulted in its receipt of a benefit for which it has not paid Plaintiff, despite Plaintiff's demand for same.

136.    Under the circumstances, Defendants SAP and ACSIS received a benefit in an amount as-yet undetermined but in excess of $25,000 for which Plaintiff should be compensated to avoid unjust enrichment to Defendants.

### COUNT VII – Civil Theft (O.R.C. §§ 2307.60-2307.61)
### (Cintas, Tice, Williams, Bova, and Schneider)

137.    Plaintiff incorporates by reference the allegations contained in the above paragraphs as if set forth fully herein.

138.    The Violation of the Ohio Uniform Trade Secret Act by Defendants constitutes "wrongful conversion", a "theft offense" pursuant to O.R.C. § 2913.01(K)(3), and is therefore subject to a civil action for damages for civil theft.

139.    By unlawfully and surreptitiously accessing/causing to be accessed, Paragon's Clearview System without the consent of, and/or beyond the scope of the express or implied consent of, Paragon, Defendants Tice, Williams, Bova, and Schneider engaged in conduct with the intent to defraud Paragon that, if prosecuted, would constitute felony theft offenses under O.R,C. § 2913.04, *to wit*, unauthorized use of computer, cable or telecommunication property.

140.    By sharing login credentials, without the express or implied consent of Paragon, to enable Tice to unlawfully and surreptitiously gain unauthorized access to Paragon's Clearview System with the intent to defraud Paragon, Defendants Tice, Williams, Bova, and Schneider engaged in conduct that, if prosecuted, would constitute a felony theft offense under O.R,C. § 2913.49, *to wit*, identity fraud.

141.    In committing the above unlawful acts, the individual Defendants were acting within the scope of their employment with, and for the express benefit of, Defendant Cintas, which is therefore vicariously liable under a theory of *respondeat superior*.

- 28 -

142. As a direct and proximate result of the civil theft by Defendants, Plaintiff is entitled to statutory damages in an amount in excess of $25,000.00 equal to the value of the stolen property, as will be more fully shown at the trial of this matter, plus liquidated damages of three times that amount.

## COUNT VIII – Civil Conspiracy
### (All Defendants)

143. Plaintiff incorporates by reference the allegations contained in the above paragraphs as if set forth fully herein.

144. The complained of unlawful conduct by Defendants constitutes a malicious combination involving two or more persons to injure Plaintiff in a way not competent for one alone, constituting a civil conspiracy.

145. As a direct and proximate result of the civil conspiracy by Defendants, Plaintiff has been damaged in an amount in excess of $25,000.00, as will be more fully shown at the trial of this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Paragon Data Systems, Inc. demands judgment in its favor and against Defendants as follows:

A. On Count One, compensatory damages against Defendants Cintas, SAP, and ACSIS, jointly and severally, in an amount in excess of $25,000.00 for Plaintiff's lost profits, disgorgement of savings enjoyed by Defendants for use of Paragon's Trade Secrets, reasonable attorneys' fees, litigation expenses, court costs and a reasonable royalty from Defendants;

B. On Count Two, compensatory damages against Defendant Cintas in an amount in excess of $25,000.00, reasonable attorneys' fees, litigation expenses, and court costs;

C. On Count Three, rescission of the 2014 License Agreement and compensatory damages against Defendant Cintas in an amount in excess of $25,000.00, punitive damages,

attorneys' fees, litigation expenses, and court costs;

D.   On Count Four, compensatory damages against Defendant Cintas in an amount in excess of $25,000.00;

E.   On Count Five, compensatory damages against Defendant Cintas in an amount in excess of $25,000.00;

F.   On Count Six, compensatory damages against Defendants SAP and ACSIS, jointly and severally, in an amount in excess of $25,000.00;

G.   On Count Seven, compensatory damages against Defendants Cintas, Tice, Williams, Bova, and Schneider, jointly and severally, equal to the value of the stolen property at the time of the theft plus liquidated damages equal to three times that amount pursuant to O.R.C. § 2307.61;

H.   On Count Eight, compensatory damages from all Defendants, jointly and severally, in an amount in excess of $25,000.00, punitive damages, attorneys' fees, litigation expenses, and court costs; and

I.   For such other and additional relief as this Court may deem just and equitable.

Respectfully submitted,


/s/ Amy A. Wuliger_____
AMY A. WULIGER, ESQ. (#0091420)
WULIGER & WULIGER
2003 St. Clair Avenue
Cleveland, Ohio 44114
t 216.781.7777 │ f 216.781.0621
awuliger@wuligerlaw.com

/s/ David B. Cupar_____
DAVID B. CUPAR (#0071622)
MATTHEW J. CAVANAGH (#0079522)
McDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
t 216.348.5400 │ f 216.348.5474
dcupar@mcdonaldhopkins.com
mcavanagh@mcdonaldhopkins.com

*Co-Counsel for Plaintiff*

- 30 -

## JURY DEMAND

Plaintiff demands trial by jury on all issues herein.

/s/ Amy A. Wuliger
AMY A. WULIGER, ESQ. (#0091420)

## INSTRUCTIONS FOR SERVICE

TO THE CLERK OF COURTS: Please serve the Defendants by Federal Express and/or

certified mail, return receipt requested at the addresses below:

**CINTAS CORPORATION**
c/o Corporation Service Company
3366 Riverside Drive, Suite 103
Upper Arlington, Ohio 43221

    Serve also at:
    6800 Cintas Blvd.
    P.O. Box 625737
    Cincinnati, OH 45262

**SAP AMERICA, INC.**
c/o The Corporation Trust Company
1209 Orange St.
Wilmington, DE 19801

    Serve also at:
    3999 West Chester Pike
    Newton Square, PA 19073

**ACSIS INC.**
c/o Corporation Service Company
251 Little Falls Drive Wilmington, DE 1980

    Serve also at:
    50 Lake Center, Executive Pkwy, Suite 201
    Marlton, NJ 08053

**GARY TICE**
8153 Jordan Valley Court
Cleves, OH 45002

**WADE WILLIAMS**
5750 McNeven Court
Dublin, OH 43017

**GREG BOVA**
7597 Herrick Park Drive
Hudson, OH 44236

**BEN SCHNEIDER**
215 Mulberry Court
Fort Thomas, KY 41071

/s/ AMY A. WULIGER
AMY A. WULIGER, ESQ. (#0091420)
WULIGER & WULIGER
2003 St. Clair Avenue
Cleveland, Ohio 44114
t 216.781.7777 | f 216.781.0621
awuliger@wuligerlaw.com

- 32 -

# MUTUAL NONDISCLOSURE AGREEMENT

This Agreement entered into as of the 28th day of September, 2009 by and between **Paragon Data Systems, Inc.,** an Ohio corporation ("PARAGON"), and Cintas Corporation, (CLIENT); including but not limited to any and all of the CLIENT's parent, subsidiary and associate corporations, and all of the officers, shareholders, directors, employees, agents and representatives of the foregoing, and their respective successors and assigns (both parties hereto collectively referred to as the "Undersigned").

PARAGON and CLIENT are interested in discussing a possible business relationship. In order to do so, the parties may disclose to each other certain proprietary business and technical information. Each party's information is proprietary, secret, and confidential, and will be disclosed to the other party only upon the following terms and conditions:

1. **Definition of Confidential Information.** "Confidential Information" shall mean all information, plans, data, inventions, products, improvements, designs, discoveries, know-how, concepts, methods, algorithms, programs, trade secrets, processes, formulas, ingredient lists, recipes, production volume, techniques, data, supplier lists, vendor information, distributor lists, customer lists, pricing, marketing and business plans, financial information (including but not limited to information, whether actual, estimated or projected), technical or scientific and all other work product or similar information of any kind or nature, whether or not patent-able or copyrightable, pertaining to the Undersigned, its business or its products, that is owned by or in the possession of CLIENT or PARAGON. Information that is disclosed only orally or visually shall not be considered Confidential Information unless such oral and visual information is confirmed in writing by the transmitting party as being proprietary or confidential within thirty (30) days after such oral or visual disclosure.

2. **Confidentiality Obligations.** The receiving party shall limit disclosure and access to Confidential Information received from the disclosing party to such of its employees as are directly involved with this project, and even then only to such extent as is necessary and essential to consider and/or complete the work involved herewith, and such employees will preserve the confidential nature of this information.

3. **Non-Disclosure; Court Order.** Proper and reasonable steps shall be taken and maintained by the receiving party to secure and protect the Confidential Information received. The receiving party shall not disclose any of the Confidential Information to any party unless required by a proper order of a court of competent jurisdiction, or other state, federal or regulatory authority, provided however, it shall provide the disclosing party reasonable advance notice and use its best efforts to minimize the disclosure of Confidential Information and will consult with and assist the disclosing party in obtaining a protective order prior to such disclosure.

4. **Reservation of Rights.** Confidential Information will be used only in connection with the mutual evaluation of the respective party's business and services; no other use will be made of it by the receiving party, it being recognized that the each party has reserved all rights and ownership to its Confidential Information. Nothing contained in this Agreement or in any Confidential Information constitutes any express or implied warranty of any kind. All representations or warranties, whether express or implied, including fitness for a particular purpose, merchantability, title, and non-infringement, are hereby disclaimed. Neither this agreement nor any Confidential Information shall create, nor shall be deemed to create, a legally binding or enforceable agreement or offer to enter into any business relationship.

5. **Non-Confidential Information.** Confidential Information shall not include that which: (a) is in the public domain prior to the disclosure to the receiving party; (b) is lawfully in the receiving party's possession prior to the disclosure by the other party; (c) becomes part of the public domain, by publication or otherwise, through no unauthorized act or omission on the part of the receiving party; or (d) is independently developed by employee(s) of the receiving party without the use of or access to Confidential Information from the disclosing party.

6. **Disclosure by Third Party.** If Confidential Information is supplied to CLIENT or PARAGON by a third party having a legal right to so disclose it, then (a) the receiving party shall have the right to use that portion of the above-mentioned Confidential Information so disclosed in connection with work done for that third party; and (b) such disclosure by that third party, if made in confidence, shall not place that portion of the above-mentioned Confidential Information in the public domain, and shall not relieve the receiving party of its obligations under this Agreement.

7. **Documents**. All documents containing Confidential Information required to be maintained in confidence under this Agreement shall remain the property of the disclosing party, and all such documents and copies thereof shall be returned to the disclosing party upon the request of the disclosing party, except that the receiving party may keep one copy of any such document in the files of its legal department for record purposes only. Documents prepared by the receiving party using such Confidential Information need not be returned, but shall, upon the disclosing party's request, be destroyed, except for one record copy which may be retained for the legal department's file.

8. **Certain Remedies.** The parties acknowledge that a breach of this Agreement shall cause irreparable harm to the disclosing party. Accordingly, the parties agrees that the disclosing party has the right to enforce this Agreement through an injunction without the posting of a bond or other security; order of specific performance; and/or other appropriate remedies. The parties further agree that any profits it may have made in violation of its obligations to the disclosing party will be held in a constructive trust. The parties further agree that this Agreement supplements, rather than replaces, any other rights or remedies the disclosing party may have under applicable law for the protection of its Confidential Information.

9. **Term.** This Agreement shall be effective for two (2) years from the date of its full execution by duly authorized representatives of both parties hereto.

10. **No License.** No license or right is granted hereby to the receiving party by implication or otherwise with respect to or under any patent application, patent, claims of patent or other proprietary rights of the disclosing party with respect to the Confidential Information. This Agreement does not create a joint venture or contractual relationship between the parties, except as provided herein.

11. **Invention Ownership.** The ownership of any invention conceived during the course of the interactions contemplated by this agreement shall be governed by United States laws of inventorship.

12. **Governing Law; Jurisdiction.** This Agreement shall be governed by the laws of the State of Ohio. CLIENT and PARAGON hereby submit to the jurisdiction of the courts of Ohio for the determination of any question or dispute arising in connection with this Agreement, and the parties hereby waive any right they may have to contest the jurisdiction, venue, or authority of any court sitting in Cleveland, Ohio. If any provision of this Agreement is declared void or unenforceable, such provision shall be modified to such extent as may be necessary to make the provision effective and enforceable within the intent of the parties expressed herein, or if such modification is not permissible, such provision shall be deemed severed from this Agreement which shall otherwise remain in full force and effect..

13. **Non-Assignment.** This Agreement shall not be assigned by either party without the prior written consent of the other party. This Agreement shall be binding upon and shall inure to the benefit of the parties and their permitted successors and assigns.

14. **Non-Waiver.** Failure to enforce any provisions of this Agreement shall not constitute a waiver of any of the terms and conditions hereof.

15. **Severability.** If any provision(s) of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

16. **Entire Agreement.** This Agreement is the entire Agreement between the parties relating to this subject matter and supersedes all prior or simultaneous representations, discussions, negotiations, and agreements, whether written or oral. No amendment, modification, or waiver of the terms or conditions of this Agreement shall be binding unless placed in writing and duly executed by the party(s) to be bound thereto.

17. **Captions; Headings.** The captions and headings herein are for convenience of reference only and shall not affect construction or interpretation of the Agreement.

**18. Authorization**.  Each party to this Agreement affirmatively states that they have been authorized by the entity that they represent to enter into this Agreement as its authorized agent.

Agreed to and accepted this <u>28th</u> day of September, 2009.


**PARAGON DATA SYSTEMS, INC.**

By: _____

Name: _____

Title: _____


**CLIENT**

By: _____

Name:  Darrell A. Boff

Title:   Vice - President

**EXHIBIT 2**

# PDS Clearview Stockroom Visibility Software System
# MASTER SERVICES AND LICENSE AGREEMENT

This MASTER SERVICES AND LICENSE AGREEMENT ("Agreement") is entered into by and between Cintas Corporation ("Customer"), with Corporate headquarters located at 6800 Cintas Boulevard, Cincinnati OH 45262 and Paragon Data Systems, Inc. ("Paragon"), located at 2218 Superior Avenue, Cleveland, Ohio 44114, in consideration of the promises made in this Agreement and intending to be legally bound, the parties do hereby agree as follows:

## ARTICLE I - Term

1.      This Agreement shall be effective commencing on May 1, 2011 ("Effective Date"), and shall remain in force and effect for a term of three (3) years. For each year in which this Agreement is in effect, Paragon shall provide to Customer the Software (as defined below) and services on the software and equipment listed on each Schedule A attached hereto for each individual site (referred to for purposes of this Agreement collectively as "Schedule A") (or any subsequent amendment thereto) of this Agreement (the "Equipment", and collectively with the Software, the "Software and Equipment").

2.      Paragon may modify the fees required under this Agreement at any time. In the event that Paragon elects to modify the fees, then Paragon shall provide Customer written notice of the price modification(s) at least ninety (90) days in advance of the price modification. Customer will then have ninety days to terminate the contract if Customer rejects Paragon's price modifications.

## ARTICLE II – Ownership and License

1.      Paragon developed and owns, and continues to develop and own, certain proprietary software used in connection with the products and services delivered under this Agreement and described on Schedule B (the "Software"). Subject to the terms and conditions of this Agreement, Paragon agrees to license to Customer the Software as more specifically described below.

2.      Customer agrees and acknowledges that (i) the Paragon name, logos, the "Clearview" name and logo and any other trademarks and service marks associated and delivered in connection with the Software; (ii) all documentation, code, and other works of authorship created by Paragon in providing the Software to Customer; (iii) the Software, including its underlying technology, software, object and source code, processes, methods, algorithms, user interfaces, know-how and other trade secrets, techniques, designs, discoveries, inventions, structure, features, components, and other tangible or intangible technical material or information; and (iv) the work product, and any other work of authorship or invention conceived of, developed, or created by Paragon relating to the Software (collectively, the "Paragon Technology") and any improvements, derivative works, or other modifications to the Paragon Technology, including those made in response to customer specifications or a Change Request (defined below), is and shall continue to be owned by Paragon. Customer further agrees and acknowledges that the Paragon Technology is or may become protected by intellectual property rights owned or licensed by Paragon (collectively, the "Paragon IP Rights"). Other than as expressly set forth in this Agreement, no license or other rights in or to the Paragon Technology or the Paragon IP Rights are granted to Customer, and all such licenses and rights are hereby expressly reserved by Paragon.



3. Subject to the terms and conditions of this Agreement (including but not limited to the payment terms and Customer's obligation to purchase Maintenance Services), Paragon hereby grants Customer a limited, non-transferable, non-exclusive, non-sublicenseable, license to use the Paragon Technology at the location(s) specified on each Schedule A for the term of this Agreement solely for the purposes contemplated by this Agreement.

4. As part of the consideration for licenses granted above, during the term of this agreement Customer expressly grants to Paragon, at Paragon's sole expense, the right to: (i) use Customer's name or logo for Paragon advertising purposes, (ii) incorporation into software screens, literature, reports, and other uses as it relates to the use and marketing of the software, and (iii) list or otherwise disclose that Customer is a customer of Paragon. Upon termination or expiration of this agreement Paragon shall make commercially reasonable efforts where possible to remove Customer's name and logo from any advertisements, software screens, literature, reports and other marketing uses. Customer understands that certain circumstances exist where Paragon cannot remove Customer's name or logo from its advertisements, software screens, literature, reports, and other marketing uses, and Paragon shall have no liability for any use of Customer's name or logo that was made prior to the termination or expiration of this agreement.

### ARTICLE III - Restrictions on use of
### Software and Documentation

1. The rights granted to Customer to the Paragon Technology hereunder are only the rights of a licensee. Title to the Paragon Technology (including, but not limited to originals, translations, compilations and partial copies, if any, and any intellectual property rights therein) does not pass to Customer by virtue of this Agreement. Customer acknowledges all Paragon Technology, including any Paragon Technology subject to Customer specifications or a Change Request, shall not be considered "works made for hire," as defined in the United States Copyright Act, 17 U.S.C. § 101 et seq.

2. The Customer agrees to promptly inform Paragon of any unauthorized use of the Paragon Technology that it becomes aware of during the term of this Agreement. Except as expressly permitted in this Agreement, Customer shall not sublicense, sell, assign, convey, transfer, disclose, publish, display, or otherwise deal with any of the Paragon Technology as may be applicable. Under no circumstances may Customer, without prior written permission from Paragon (i) use the Paragon Technology to provide services to a third party; (ii) directly or indirectly provide access to the Paragon Technology to a third party; (iii) copy or permit a third party to copy the Paragon Technology; or (iv) duplicate, examine, adapt, merge, embed, decompile, disassemble, "un-lock", reverse engineer, or create a derivative work from any of the Paragon Technology. In the event Paragon provides written permission to engage in any of the restricted acts above, all titles, trademarks, and copyright and restricted rights notices shall be reproduced in such copies and all such copies shall be subject to the terms of this Agreement. Customer expressly acknowledges that use of the Paragon Technology in a manner not expressly authorized by this Agreement or in a manner that violates any of the restrictions shall constitute copyright infringement, entitling Paragon to exercise all rights and remedies available to it under copyright laws around the world in addition to any other remedies that may be available to Paragon in law or equity.

3. Subject to the terms of this Agreement and Customer's payment of all required fees, Paragon shall defend, hold harmless, and indemnify Customer from any claim that the Software infringes upon any intellectual property right or trade secret of a third party (each, a "Claim") and will pay all costs and damages finally awarded as a result thereof provided that Customer provides prompt notice of any such Claim. Customer shall cooperate with Paragon in the defense or settlement of any Claim. If such a Claim is made or appears possible (in Paragon's sole opinion), Paragon may, at its option, secure for Customer the right to continue to use the Software, modify or replace the Software so that it is noninf ringing, or, if neither of the foregoing



options is reasonably available (in Paragon's sole opinion), require Customer to return the infringing the Software for a full refund. Paragon shall have no obligation to indemnify Customer (as set out in this Paragraph) for any claim (a) based on Customer's modification or misuse of the Software, (b) based on the combination, operation or use of the Software with any product, data, software, hardware or apparatus not provided by Paragon, or (c) based on any Software specifically designed for Customer's specifications. THIS FOREGOING IS CUSTOMER'S SOLE REMEDY FOR CLAIMS OF INFRINGEMENT

      4.     Customer acknowledges that Paragon possesses the right to use, sell and otherwise transfer, dispose of or deal in any of the Paragon Technology or any portion of the Paragon Technology in any manner it determines and that this Agreement in no way requires Paragon to provide the Paragon Technology, or any portion thereof, to Customer on an exclusive basis except as provided in Article XIII.

      5.     Customer may not distribute the Paragon Technology or any portion thereof, including executable portions of the Software, for its own use without paying the License Fee and Hardware fees per unit. This includes all portable units and related personal computer programs that are used for database access, the software database and communications software deployed on the servers.

      6.     In the event Customer becomes subject to a bankruptcy proceeding, the bankruptcy trustee shall protect Paragon with respect to trade secrets or confidential research, development, or confidential information, in accordance with 11 U.S.C. § 107(b) and Customer agrees to cooperate with any and all reasonable demands to ensure those protections.

## ARTICLE IV - Maintenance Services

      1.     Customer acknowledges that the rights granted under Article II are subject to maintaining the maintenance services as set forth on Schedule A for the then-current term under this Agreement. Paragon shall provide (1) the maintenance services as described more fully below and (2) updates to the Software at the time that Paragon releases any such updates generally to its customers without any additional charge, exclusive of billable change orders.

      2.     Provided that Customer has paid for maintenance services, Paragon shall provide telephonic diagnostic consultation services to Customer with respect to the Software and Equipment during Paragon's normal business hours which are 8:30 a.m. to 5:00 p.m., E.S.T., Monday through Friday, all legal holidays excepted. In the event that Paragon is unable to resolve Customer's problem regarding the Software and Equipment by means of the telephonic diagnostic consultation, then Customer shall ship the Equipment to Paragon at the address set forth above, or at any other address which Paragon may from time to time direct Customer in writing to utilize, for further diagnostic analysis and repair. Paragon shall provide all labor and necessary replacement parts for the Equipment at no cost to Customer, excluding printheads for the printers. Should Customer require services in excess of those listed above or at times outside those listed for service, Customer shall initiate a Change Request (as defined in Article VI.3. below).

      3.     Paragon, within its sole discretion, may provide preventive maintenance during normal business hours, with the schedule to be based on the needs of the Software and Equipment as determined by Paragon.

## ARTICLE V - Customer's Obligations

      1.     Customer shall be responsible for the operation, storage and maintenance of all Software and all equipment loaned to Customer during the term ("Loaned Equipment") accordance with Paragon's specifications.



2. Customer represents and warrants that the Software and all Equipment set forth on Schedule A is fully operational and in good working condition on the effective date of this Agreement. This paragraph shall not apply to any new Software and Loaned Equipment that is provided by Paragon.

3. Customer and Paragon further represent and warrant that they have all necessary authority to enter into this Agreement and that entering into this Agreement does not conflict with any other obligation of Customer and Paragon or violate any law or regulation applicable to Customer and Paragon.

4. Customer, upon the termination of this Agreement for any reason, shall promptly uninstall all Software and other Paragon Technology, and return any loaned equipment, supplies, materials, manuals, and any other property of any kind that Paragon loaned to Customer for the purposes of support during the term of this Agreement.

5. Customer expressly understands that Paragon has instructed it to remove any and all software not provided by Paragon, any stored data and external devices owned exclusively by Customer from all Loaned Equipment and that Paragon shall not be liable for any loss, disclosure of, or damage to such programs, software, data, or devices.

6. Customer shall provide to Paragon remote access capabilities in a mutually agreed upon method.

## ARTICLE VI - Charges for Maintenance Services

1. The annual charge for the maintenance services Paragon provides for each item of Software (the "Software Maintenance Fee") and Equipment (the "Hardware Maintenance Fee"), pursuant to the terms of this Agreement, is set forth on Schedule A, and shall be separately invoiced to the site at which it is installed and will constitute that site's Schedule A. There will be one Schedule A per installed site. The separate invoicing to each site shall not affect Customer's primary liability for the payment for services under this Agreement.

2. Upon written agreement between Paragon and Customer, Customer may purchase additional Software or Equipment for sites and add to Schedule A as "New Sites." Software and Equipment for all New Sites shall be subject to the Software License Fee, Hosting Fee, and additional Software and Hardware Maintenance Fees in existence on the Effective Date listed on that Site's Schedule A. The annual charge for the Software and Hardware Maintenance Fees for New Sites are set forth on each site's Schedule A or will be set forth on an amended Schedule A to be mutually executed by the parties and incorporated into this Agreement.

3. Should Customer seek to add, change, or otherwise modify the functionality of the Software described on Schedule B or require services beyond the scope detailed in Article IV.2., the Customer shall provide a written change order request. Upon submission of each change order request to Paragon, the parties shall agree in writing to the terms (including but not limited to price and completion dates) for each such change request (as executed by the parties, a "Change Request"). The parties agree that each Change Request shall increase the cost of annual Software Maintenance Fee by 20% of the total cost of the change order on the next annual billing of the software. The parties further agree that any Change Request shall be subject to the terms of this Agreement. In the event of a conflict between the terms of any Change Request and the terms of this Agreement, this Agreement shall control unless expressly stated otherwise in the Change Request executed by the parties.

4. Customer shall be solely responsible for, and shall pay in advance of shipping, any shipping charges, including insurance, necessitated as a result of shipping any Software and/or Equipment to Paragon pursuant to the terms of this Service Agreement.

Page 4 of 9



5.      Paragon shall be solely responsible for, and shall pay in advance of shipping, standard shipping charges, including insurance, necessitated as a result of shipping any Software and/or Equipment to Customer pursuant to the terms of this Service Agreement. Expedited shipping at Customer request will be billable to Customer.

### ARTICLE VII - Payment

1.      Initial Payment by Site. The payment and effective date of service shall be billed and renewed on a per site basis. Upon the Effective Date of this Agreement Customer shall pay Paragon an amount equal to the Software License Fee, Hosting Fee, Software Maintenance Fee, and the Hardware Maintenance as set forth on the site's Schedule A (the "Initial Payment").

2.      Software Maintenance Fee. Following the Initial Payment, Customer shall pay to Paragon on the one-year anniversary of the Effective Date and for each year thereafter for the then-current term of the Agreement the Software Maintenance Fee set forth on Schedule A (or any amended Schedule A as applicable). For New Sites added less than one year before the next required payment date of the Software Maintenance Fee, Customer shall pay the full amount of the required Software Maintenance Fee and any required Software License Fee for the New Sites; provided, however, that Paragon will prorate the Software Maintenance Fee for those New Site's next required Software Maintenance Fee payment and Customer shall only be obligated to pay that prorated amount for that payment period for those New Sites.

3.      Hardware Maintenance Fee. Following the Initial Payment, each Customer site shall pay Paragon the Hardware Maintenance Fee set forth on Schedule A (or any amended Schedule A as applicable) on the first day of any renewal term for that site. For hardware added to Sites before the expiration of the then-current term, Customer Site shall pay to Paragon the full amount listed on Schedule A (or any amended Schedule A as applicable) for those Sites and Paragon will prorate the Hardware Maintenance Fee for the New Sites for the next required Hardware Maintenance Fee payment and Customer Site shall only be obligated to pay that prorated amount for that payment period.

4.      Customer shall be solely responsible for and shall pay, or reimburse Paragon, for all taxes arising as a result of this Agreement, including all sales, use and property taxes, except for Paragon's income taxes.

5.      All costs, expenses, fees, and charges, (other than the Total Annual Contract Price), including charges for Bar Code Products, shall be invoiced by Paragon when they are incurred and shall be due and payable within thirty (30) days of the date of the invoice.

### ARTICLE VIII - Exclusive Supplier

1.      Paragon and Customer agree that during the initial term and any subsequent renewal terms of this Agreement, that Paragon shall sell to Customer and Customer shall purchase from Paragon all equipment, bar code supplies, grading tags and ribbons, and all replacement parts, spare parts, attachments and accessories (collectively referred to as "Bar Code Products") which are used in the operation of the Software and Equipment listed on Schedule C. Any violation of this provision shall be grounds for Paragon to immediately terminate this Agreement, including the licenses contained herein.

2.      Paragon may modify the prices for the Bar Code Products set forth on Schedule C for any renewal term of this Agreement. Paragon shall provide Customer with written notice of the modification of the prices at least ninety (90) days in advance of the termination of the then existing term.



3.     In return for utilizing Pargon as its exclusive supplier, Paragon agrees not to provide the Paragon Technology to any of Customer's direct competitors as listed in Schedule D of this Agreement during the initial term and any subsequent renewal terms. Schedule D may be updated during the term of this agreement only by agreement between the parties. Paragon maintains the right to use the Paragon Technology for competitors to Customer not listed in Schedule D of this Agreement.  This exclusivity agreement shall terminate immediately upon termination or expiration of this Agreement for any reason.

### ARTICLE IX - Matters Regarding Safety

1.     Paragon has the responsibility for the safety of its own employees and its agents and business invitees (hereinafter collectively referred to as "such persons"), while such persons are engaged in activities related to this Agreement.  Customer will provide a safe work place for all such persons to perform this Agreement. Paragon shall use reasonable efforts to include provisions similar to those in this paragraph in all subcontracts let by Paragon so that each of Paragon's subcontractors undertake the same safety responsibility while engaged in activities related to this Agreement.

2.     During the term of this Agreement, Paragon agrees and covenants to obtain and maintain comprehensive general liability insurance (including coverage for automobile liability) from reputable insurance companies with limits, deductibles, and other terms and conditions as are reasonable with the activities undertaken by Paragon under this Agreement.

### ARTICLE X- Termination on Occurrence of Stated Events

1.     If Customer fails to pay Paragon all or any part of any charges incurred pursuant to the terms of this Agreement on the date due, Paragon may terminate this Agreement, including all licenses contained herein, by giving written notification to Customer, only after Paragon has provided written notice to Customer setting forth the past due charges and providing Customer ten (10) business days to pay said charges.

2.     If either party defaults in the performance of this Agreement or materially breaches any of the provisions of this Agreement, then either party at their option, may terminate this Agreement by giving written notification to the other party, only after said party has provided written notice to the other party setting forth the alleged breach of this Agreement and providing said party ten (10) business days to remedy the breach unless stated otherwise in this Agreement.

3.     Neither Party shall be liable for any delays in performance, or inability to perform, directly or indirectly resulting from acts of Customer, its agents, employees, vendors, or subcontractors, or causes beyond the control of either Party. "Causes beyond the control of either Party" shall include, but are not limited to: Acts of God, Acts of a public enemy, Acts of Government, Fire, Flood, Strikes, civil commotion, revolution, embargoes, unusually severe weather conditions, Default of either Party's subcontractors or suppliers, and other occurrences that would customarily be considered *force majeure* in a commercial contract.

### ARTICLE XI - Warranty

1. (a)   Paragon warrants the services furnished pursuant to this Agreement shall be free from defects in workmanship and that the Software and Equipment, components, parts and/or Bar Code Products furnished pursuant to this Agreement shall be free from defects in workmanship and material for a period of twelve (12) months from the date of delivery to Customer.



(b)     The foregoing warranty and conditions shall apply to any new, repaired or replaced Software and Equipment, components, parts and/or Bar Code Products supplied by Paragon.

(c)     Customer's remedies are limited solely to Paragon's obligations to repair or replace, at Paragon's sole discretion, the Software and Equipment, component, part and/or Bar Code Product.

(d)     Customer shall submit in writing any claim against this warranty to Paragon within twelve (12) months from the date of delivery of the Software and Equipment, parts, and/or Bar Code Products to Customer.

2.     **EXCEPT FOR PARAGON'S INDEMNIFICATION OBLIGATIONS, IN NO EVENT SHALL THE AGGREGATE LIABILITY OF EITHER PARTY (INCLUDING LIABILITY TO ANY PERSON OR PERSONS WHOSE CLAIM OR CLAIMS ARE BASED ON OR DERIVED FROM A RIGHT OR RIGHTS CLAIMED BY LICENSEE), WITH RESPECT TO ANY AND ALL CLAIMS AT ANY AND ALL TIMES ARISING FROM OR RELATED TO THE SUBJECT MATTER FOR THIS AGREEMENT, IN CONTRACT, TORT, OR OTHERWISE, EXTEND BEYOND THE TOTAL AMOUNT PAID TO LICENSOR UNDER THIS AGREEMENT AT THE TIME THE LIABILITY IS DETERMINED. NEITHER PARTY SHALL BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES OR FOR THE LOSS OF PROFIT, REVENUE, OR DATA ARISING OUT OF THE SERVICES AND/OR SOFTWARE AND EQUIPMENT, COMPONENTS, PARTS AND/OR BAR-CODE PRODUCTS AND/OR ANY OTHER PORTION OF THIS AGREEMENT.**

3.     **THIS WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OR OTHERWISE.**

4.     This warranty does not apply to any Software, Equipment, components, parts and/or Bar-code Products that have been modified (other than by Paragon), subjected to improper use or operation, installation, or maintenance, repaired or serviced by any person other than Paragon, or that have not been used or operated in accordance with Paragon's and/or the manufacturer's specifications.

5.     Customer's sole remedies for the breach of any warranties contained in this Agreement shall be limited to the remedies provided in this Agreement.  Paragon's liability to Customer for damages of any nature shall not exceed the total charges paid by Customer under this Agreement.

### ARTICLE XII – Confidentiality

1.     As used herein, "Confidential Information" means all confidential and proprietary information of a party ("Disclosing Party") disclosed to the other party ("Receiving Party"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure, including the terms and conditions of this Agreement, the Paragon Technology, Customer information, technology and technical information, product designs, and business processes. Confidential Information shall not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (iii) was independently developed by the Receiving Party without breach of any obligation owed to the Disclosing Party; or (iv) is received from a third party without breach of any obligation owed to the Disclosing Party.



Page 7 of 9

2. The Receiving Party shall not disclose or use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, except with the Disclosing Party's prior written permission.

3. Each party agrees to protect the confidentiality of the Confidential Information of the other party in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind, but in no event shall either party exercise less than commercially reasonable care in protecting such Confidential Information.

4. If the Receiving Party is compelled by law to disclose Confidential Information of the Disclosing Party, it shall provide the Disclosing Party with prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure.

5. If the Receiving Party discloses or uses (or threatens to disclose or use) any Confidential Information of the Disclosing Party in breach of this Section, the Disclosing Party shall have the right, in addition to any other remedies available to it, to seek injunctive relief to enjoin such acts, it being specifically acknowledged by the parties that any other available remedies are inadequate.

### ARTICLE XIII - NON-SOLICITATION

1. During the term of this Agreement and three (3) years thereafter, Customer shall not hire any employee, former employee, independent contractor, or subcontractor of Paragon, who had knowledge of the Paragon Technology, for the direct purpose of technical support, programming, enhancements, documentation, coding, etc. for the Clearview system or any of its related systems, such as, Clearview Warning System, Clearview Market Place, Cleanview, or for any technical purpose as it relates to filling Cintas Garment Requests through shared storeroom garments. Nothing in this Article XIII shall be deemed to limit Customer's recruiting efforts directed at the general public.

### ARTICLE XIV – Miscellaneous

1. This Agreement shall be binding on and inure to the benefit of Paragon and Customer and their respective successors. Customer may not assign this Agreement without written consent from Paragon.

2. Any notices required by this Agreement to be given by one party to the other party shall be made in writing to that party at the address shown at the beginning of this Agreement or at any other address that may be designated in writing from time to time by that party. All notices shall be delivered U.S. Certified Mail or Via Facsimile prepaid, and shall be effective upon the receipt by the party.

3. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio. Any suit relating to this Agreement shall be instituted in a state or federal court in Cuyahoga County, Ohio, and the parties to this Agreement hereby waive any dispute over and agree to the venue and personal jurisdiction in such a court.

4. If any legal action is necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees in addition to any other relief to which that party may be entitled. This provision shall be construed as applicable to the entire Agreement.



5.      This Agreement supersedes any and all agreements, both oral and written, between the parties with respect to the subject matter of this Agreement and contains all of the covenants and agreements between the parties with respect to the subject matter of this Agreement.

6.      If any provision in this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions will nevertheless continue in full force and effect without being impaired or invalidated in any way.

7.      Paragon and Customer agree that no failure to exercise and no delay in exercising any right, power, or privilege under this Agreement on the part of either party shall operate as a waiver of any right, power, or privilege under this Agreement. However, Paragon and Customer expressly agree that the various deadlines for the performance of certain acts provided in this Agreement are mandatory and cannot be waived, unless waived in writing by Paragon and Customer.

IN WITNESS WHEREOF, the parties have executed this Agreement this 1st. day of May, 2011.

PARAGON DATA SYSTEMS, INC.

By: _____

Date: _____

Its: _____

Cintas Corporation

By: _____

Date: _____

Its: _____



# PDS Clearview Stockroom Visibility Software System
# MASTER SERVICES AND LICENSE AGREEMENT

This MASTER SERVICES AND LICENSE AGREEMENT ("Agreement") is entered into by and between Cintas Corporation ("Customer"), with Corporate headquarters located at 6800 Cintas Boulevard, Cincinnati OH 45262 and Paragon Data Systems, Inc. ("Paragon"), located at 2218 Superior Avenue, Cleveland, Ohio 44114, in consideration of the promises made in this Agreement and intending to be legally bound, the parties do hereby agree as follows:

## ARTICLE I - Term

1. This Agreement shall be effective commencing on May 1, 2014 ("Effective Date"), and shall remain in force and effect for a term of three (3) years. For each year in which this Agreement is in effect, Paragon shall provide to Customer the Software (as defined below) and services on the software and equipment listed on each <u>Schedule A</u> attached hereto for each individual site (referred to for purposes of this Agreement collectively as "Schedule A") (or any subsequent amendment thereto) of this Agreement (the "Equipment", and collectively with the Software, the "Software and Equipment").

2. ~~Paragon may modify the fees required under this Agreement at any time. In the event that Paragon elects to modify the fees, then Paragon shall provide Customer written notice of the price modification(s) at least ninety (90) days in advance of the price modification. Customer will then have ninety days to terminate the contract if Customer rejects Paragon's price modifications.~~

*5.28.14*
*TA.*

## ARTICLE II – Ownership and License

1. Paragon developed and owns, and continues to develop and own, certain proprietary software used in connection with the products and services delivered under this Agreement and described on <u>Schedule B</u> (the "Software"). Subject to the terms and conditions of this Agreement, Paragon agrees to license to Customer the Software as more specifically described below.

2. Customer agrees and acknowledges that (i) the Paragon name, logos, the "Clearview" name and logo and any other trademarks and service marks associated and delivered in connection with the Software; (ii) all documentation, code, and other works of authorship created by Paragon in providing the Software to Customer; (iii) the Software, including its underlying technology, software, object and source code, processes, methods, algorithms, user interfaces, know-how and other trade secrets, techniques, designs, discoveries, inventions, structure, features, components, and other tangible or intangible technical material or information; and (iv) the work product, and any other work of authorship or invention conceived of, developed, or created by Paragon relating to the Software (collectively, the "Paragon Technology") and any improvements, derivative works, or other modifications to the Paragon Technology, including those made in response to customer specifications or a Change Request (defined below), is and shall continue to be owned by Paragon. Customer further agrees and acknowledges that the Paragon Technology is or may become protected by intellectual property rights owned or licensed by Paragon (collectively, the "Paragon IP Rights"). Other than as expressly set forth in this Agreement, no license or other rights in or to the Paragon Technology or the Paragon IP Rights are granted to Customer, and all such licenses and rights are hereby expressly reserved by Paragon.

3. Subject to the terms and conditions of this Agreement (including but not limited to the payment terms and Customer's obligation to purchase Maintenance Services), Paragon hereby grants Customer a limited, non-transferable, non-exclusive, non-sublicenseable, license to

Page | 1

use the Paragon Technology at the location(s) specified on each Schedule A for the term of this Agreement solely for the purposes contemplated by this Agreement.

4.      As part of the consideration for licenses granted above, during the term of this agreement Customer expressly grants to Paragon, at Paragon's sole expense, the right to: (i) use Customer's name or logo for Paragon advertising purposes, (ii) incorporation into software screens, literature, reports, and other uses as it relates to the use and marketing of the software, and (iii) list or otherwise disclose that Customer is a customer of Paragon. Upon termination or expiration of this agreement Paragon shall make commercially reasonable efforts where possible to remove Customer's name and logo from any advertisements, software screens, literature, reports and other marketing uses. Customer understands that certain circumstances exist where Paragon cannot remove Customer's name or logo from its advertisements, software screens, literature, reports, and other marketing uses, and Paragon shall have no liability for any use of Customer's name or logo that was made prior to the termination or expiration of this agreement.

### ARTICLE III - Restrictions on use of
### Software and Documentation

1.      The rights granted to Customer to the Paragon Technology hereunder are only the rights of a licensee. Title to the Paragon Technology (including, but not limited to originals, translations, compilations and partial copies, if any, and any intellectual property rights therein) does not pass to Customer by virtue of this Agreement. Customer acknowledges all Paragon Technology, including any Paragon Technology subject to Customer specifications or a Change Request, shall not be considered "works made for hire," as defined in the United States Copyright Act, 17 U.S.C. § 101 et seq.

2.      The Customer agrees to promptly inform Paragon of any unauthorized use of the Paragon Technology that it becomes aware of during the term of this Agreement. Except as expressly permitted in this Agreement, Customer shall not sublicense, sell, assign, convey, transfer, disclose, publish, display, or otherwise deal with any of the Paragon Technology as may be applicable. Under no circumstances may Customer, without prior written permission from Paragon (i) use the Paragon Technology to provide services to a third party; (ii) directly or indirectly provide access to the Paragon Technology to a third party; (iii) copy or permit a third party to copy the Paragon Technology; or (iv) duplicate, examine, adapt, merge, embed, decompile, disassemble, "un-lock", reverse engineer, or create a derivative work from any of the Paragon Technology. In the event Paragon provides written permission to engage in any of the restricted acts above, all titles, trademarks, and copyright and restricted rights notices shall be reproduced in such copies and all such copies shall be subject to the terms of this Agreement. Customer expressly acknowledges that use of the Paragon Technology in a manner not expressly authorized by this Agreement or in a manner that violates any of the restrictions shall constitute copyright infringement, entitling Paragon to exercise all rights and remedies available to it under copyright laws around the world in addition to any other remedies that may be available to Paragon in law or equity.

3.      Subject to the terms of this Agreement and Customer's payment of all required fees, Paragon shall defend, hold harmless, and indemnify Customer from any claim that the Software infringes upon any intellectual property right or trade secret of a third party (each, a "Claim") and will pay all costs and damages finally awarded as a result thereof provided that Customer provides prompt notice of any such Claim. Customer shall cooperate with Paragon in the defense or settlement of any Claim. If such a Claim is made or appears possible (in Paragon's sole opinion), Paragon may, at its option, secure for Customer the right to continue to use the Software, modify or replace the Software so that it is noninfringing, or, if neither of the foregoing options is reasonably available (in Paragon's sole opinion), require Customer to return the infringing the Software for a full refund. Paragon shall have no obligation to indemnify Customer (as set out in this Paragraph) for any claim (a) based on Customer's modification or misuse of the Software, (b) based on the combination, operation or use of the Software with any product, data,

Page | 2

software, hardware or apparatus not provided by Paragon, or (c) based on any Software specifically designed for Customer's specifications. THIS FOREGOING IS CUSTOMER'S SOLE REMEDY FOR CLAIMS OF INFRINGEMENT

     4.    Customer acknowledges that Paragon possesses the right to use, sell and otherwise transfer, dispose of or deal in any of the Paragon Technology or any portion of the Paragon Technology in any manner it determines and that this Agreement in no way requires Paragon to provide the Paragon Technology, or any portion thereof, to Customer on an exclusive basis except as provided in Article XIII.

     5.    Customer may not distribute the Paragon Technology or any portion thereof, including executable portions of the Software, for its own use without paying the License Fee and Hardware fees per unit. This includes all portable units and related personal computer programs that are used for database access, the software database and communications software deployed on the servers.

     6.    In the event Customer becomes subject to a bankruptcy proceeding, the bankruptcy trustee shall protect Paragon with respect to trade secrets or confidential research, development, or confidential information, in accordance with 11 U.S.C. § 107(b) and Customer agrees to cooperate with any and all reasonable demands to ensure those protections.

## ARTICLE IV - Maintenance Services

     1.    Customer acknowledges that the rights granted under Article II are subject to maintaining the maintenance services as set forth on Schedule A for the then-current term under this Agreement. Paragon shall provide (1) the maintenance services as described more fully below and (2) updates to the Software at the time that Paragon releases any such updates generally to its customers without any additional charge, exclusive of billable change orders.

     2.    Provided that Customer has paid for maintenance services, Paragon shall provide telephonic diagnostic consultation services to Customer with respect to the Software and Equipment during Paragon's normal business hours which are 8:30 a.m. to 5:00 p.m., E.S.T., Monday through Friday, all legal holidays excepted. In the event that Paragon is unable to resolve Customer's problem regarding the Software and Equipment by means of the telephonic diagnostic consultation, then Customer shall ship the Equipment to Paragon at the address set forth above, or at any other address which Paragon may from time to time direct Customer in writing to utilize, for further diagnostic analysis and repair. Paragon shall provide all labor and necessary replacement parts for the Equipment at no cost to Customer, excluding printheads for the printers. Should Customer require services in excess of those listed above or at times outside those listed for service, Customer shall initiate a Change Request (as defined in Article VI.3. below).

     3.    Paragon, within its sole discretion, may provide preventive maintenance during normal business hours, with the schedule to be based on the needs of the Software and Equipment as determined by Paragon.

## ARTICLE V - Customer's Obligations

     1.    Customer shall be responsible for the operation, storage and maintenance of all Software and all equipment loaned to Customer during the term ("Loaned Equipment") accordance with Paragon's specifications.

2.    Customer represents and warrants that the Software and all Equipment set forth on Schedule A is fully operational and in good working condition on the effective date of this Agreement. This paragraph shall not apply to any new Software and Loaned Equipment that is provided by Paragon.

3.    Customer and Paragon further represent and warrant that they have all necessary authority to enter into this Agreement and that entering into this Agreement does not conflict with any other obligation of Customer and Paragon or violate any law or regulation applicable to Customer and Paragon.

4.    Customer, upon the termination of this Agreement for any reason, shall promptly uninstall all Software and other Paragon Technology, and return any loaned equipment, supplies, materials, manuals, and any other property of any kind that Paragon loaned to Customer for the purposes of support during the term of this Agreement.

5.    Customer expressly understands that Paragon has instructed it to remove any and all software not provided by Paragon, any stored data and external devices owned exclusively by Customer from all Loaned Equipment and that Paragon shall not be liable for any loss, disclosure of, or damage to such programs, software, data, or devices.

6.    Customer shall provide to Paragon remote access capabilities in a mutually agreed upon method.

### ARTICLE VI - Charges for Maintenance Services

1.    The annual charge for the maintenance services Paragon provides for each item of Software (the "Software Maintenance Fee") and Equipment (the "Hardware Maintenance Fee"), pursuant to the terms of this Agreement, is set forth on Schedule A, and shall be separately invoiced to the site at which it is installed and will constitute that site's Schedule A. There will be one Schedule A per installed site. The separate invoicing to each site shall not affect Customer's primary liability for the payment for services under this Agreement.

2.    Upon written agreement between Paragon and Customer, Customer may purchase additional Software or Equipment for sites and add to Schedule A as "New Sites." Software and Equipment for all New Sites shall be subject to the Software License Fee, Hosting Fee, and additional Software and Hardware Maintenance Fees in existence on the Effective Date listed on that Site's Schedule A. The annual charge for the Software and Hardware Maintenance Fees for New Sites are set forth on each site's Schedule A or will be set forth on an amended Schedule A to be mutually executed by the parties and incorporated into this Agreement.

A.    Customer has expressed an interest in lowering the Annual Maintenance Fee. This can be accomplished by adding at a minimum 35 sites within the current contract term. Paragon has agreed to reduce the Annual Software Maintenance Fee for all of Customer sites should Customer add the thirty five (35) new sites in accordance with the following terms and conditions:

1. On or before May 1, 2015, Customer shall provide to Paragon a list which identifies a minimum of thirty five (35) new sites which will be added to the Agreement during the next twenty four (24) months; and

2. Upon Paragon's receipt of the list identified in the preceding paragraph, Paragon shall immediately contact the new sites in order to evaluate its needs and prepare and send to each new site a Schedule A. Upon Paragon's receipt of all of the fully executed Schedule A's for the newly identified sites, Paragon shall reduce the Annual Maintenance Fee for the remainder of the term of this Agreement for all sites by $2,000.00 per site, per year. Should the newly identified sites fail to execute and abide by the terms and conditions of the Schedule A and this Agreement, or should the newly identified sites fail to cooperate in the installation of the hardware and software and activation date established by Paragon, then the reduction in the Annual Maintenance Fee for all sites shall be forfeited and

Page | 4

Customer and all sites shall be obligated to pay Annual Software Maintenance Fees in the amount of $4,000 per site for the entire term of the Agreement.

3.    Should Customer seek to add, change, or otherwise modify the functionality of the Software described on Schedule B or require services beyond the scope detailed in Article IV.2., the Customer shall provide a written change order request. Upon submission of each change order request to Paragon, the parties shall agree in writing to the terms (including but not limited to price and completion dates) for each such change request (as executed by the parties, a "Change Request"). The parties agree that each Change Request shall increase the cost of annual Software Maintenance Fee by 20% of the total cost of the change order on the next annual billing of the software. The parties further agree that any Change Request shall be subject to the terms of this Agreement. In the event of a conflict between the terms of any Change Request and the terms of this Agreement, this Agreement shall control unless expressly stated otherwise in the Change Request executed by the parties.

4.    Customer shall be solely responsible for, and shall pay in advance of shipping, any shipping charges, including insurance, necessitated as a result of shipping any Software and/or Equipment to Paragon pursuant to the terms of this Service Agreement.

5.    Paragon shall be solely responsible for, and shall pay in advance of shipping, standard shipping charges, including insurance, necessitated as a result of shipping any Software and/or Equipment to Customer pursuant to the terms of this Service Agreement. Expedited shipping at Customer request will be billable to Customer.

### ARTICLE VII - Payment

1.    Initial Payment by Site. The payment and effective date of service shall be billed and renewed on a per site basis. Upon the Effective Date of this Agreement Customer shall pay Paragon an amount equal to the Software License Fee, Hosting Fee, Software Maintenance Fee, and the Hardware Maintenance as set forth on the site's Schedule A (the "Initial Payment").

2.    Software Maintenance Fee. Following the Initial Payment, Customer shall pay to Paragon on the one-year anniversary of the Effective Date and for each year thereafter for the then-current term of the Agreement the Software Maintenance Fee set forth on Schedule A (or any amended Schedule A as applicable). For New Sites added less than one year before the next required payment date of the Software Maintenance Fee, Customer shall pay the full amount of the required Software Maintenance Fee and any required Software License Fee for the New Sites; provided, however, that Paragon will prorate the Software Maintenance Fee for those New Site's next required Software Maintenance Fee payment and Customer shall only be obligated to pay that prorated amount for that payment period for those New Sites.

3.    Hardware Maintenance Fee. Following the Initial Payment, each Customer site shall pay Paragon the Hardware Maintenance Fee set forth on Schedule A (or any amended Schedule A as applicable) on the first day of any renewal term for that site. For hardware added to Sites before the expiration of the then-current term, Customer Site shall pay to Paragon the full amount listed on Schedule A (or any amended Schedule A as applicable) for those Sites and Paragon will prorate the Hardware Maintenance Fee for the New Sites for the next required Hardware Maintenance Fee payment and Customer Site shall only be obligated to pay that prorated amount for that payment period.

Page | 5

4. Customer shall be solely responsible for and shall pay, or reimburse Paragon, for all taxes arising as a result of this Agreement, including all sales, use and property taxes, except for Paragon's income taxes.

5. All costs, expenses, fees, and charges, (other than the Total Annual Contract Price), including charges for Bar Code Products, shall be invoiced by Paragon when they are incurred and shall be due and payable within thirty (30) days of the date of the invoice.

## ARTICLE VIII - Exclusive Supplier

1. Paragon and Customer agree that during the initial term and any subsequent renewal terms of this Agreement, that Paragon shall sell to Customer and Customer shall purchase from Paragon all equipment, bar code supplies, grading tags and ribbons, and all replacement parts, spare parts, attachments and accessories (collectively referred to as "Bar Code Products") which are used in the operation of the Software and Equipment listed on Schedule C. Any violation of this provision shall be grounds for Paragon to immediately terminate this Agreement, including the licenses contained herein.

2. Paragon may modify the prices for the Bar Code Products set forth on Schedule C for any renewal term of this Agreement. Paragon shall provide Customer with written notice of the modification of the prices at least ninety (90) days in advance of the termination of the then existing term.

3. In return for utilizing Pargon as its exclusive supplier, Paragon agrees not to provide the Paragon Technology to any of Customer's direct competitors as listed in Schedule D of this Agreement during the initial term and any subsequent renewal terms. Schedule D may be updated during the term of this agreement only by agreement between the parties. Paragon maintains the right to use the Paragon Technology for competitors to Customer not listed in Schedule D of this Agreement. This exclusivity agreement shall terminate immediately upon termination or expiration of this Agreement for any reason.

## ARTICLE IX - Matters Regarding Safety

1. Paragon has the responsibility for the safety of its own employees and its agents and business invitees (hereinafter collectively referred to as "such persons"), while such persons are engaged in activities related to this Agreement. Customer will provide a safe work place for all such persons to perform this Agreement. Paragon shall use reasonable efforts to include provisions similar to those in this paragraph in all subcontracts let by Paragon so that each of Paragon's subcontractors undertake the same safety responsibility while engaged in activities related to this Agreement.

2. During the term of this Agreement, Paragon agrees and covenants to obtain and maintain comprehensive general liability insurance (including coverage for automobile liability) from reputable insurance companies with limits, deductibles, and other terms and conditions as are reasonable with the activities undertaken by Paragon under this Agreement.

## ARTICLE X- Termination on Occurrence of Stated Events

1. If Customer fails to pay Paragon all or any part of any charges incurred pursuant to the terms of this Agreement on the date due, Paragon may terminate this Agreement, including all licenses contained herein, by giving written notification to Customer, only after Paragon has provided written notice to Customer setting forth the past due charges and providing Customer ten (10) business days to pay said charges.

2.    If either party defaults in the performance of this Agreement or materially breaches any of the provisions of this Agreement, then either party at their option, may terminate this Agreement by giving written notification to the other party, only after said party has provided written notice to the other party setting forth the alleged breach of this Agreement and providing said party ten (10) business days to remedy the breach unless stated otherwise in this Agreement.

3.    Neither Party shall be liable for any delays in performance, or inability to perform, directly or indirectly resulting from acts of Customer, its agents, employees, vendors, or subcontractors, or causes beyond the control of either Party. "Causes beyond the control of either Party" shall include, but are not limited to: Acts of God, Acts of a public enemy, Acts of Government, Fire, Flood, Strikes, civil commotion, revolution, embargoes, unusually severe weather conditions, Default of either Party's subcontractors or suppliers, and other occurrences that would customarily be considered *force majeure* in a commercial contract.

### ARTICLE XI - Warranty

1. (a)    Paragon warrants the services furnished pursuant to this Agreement shall be free from defects in workmanship and that the Software and Equipment, components, parts and/or Bar Code Products furnished pursuant to this Agreement shall be free from defects in workmanship and material for a period of twelve (12) months from the date of delivery to Customer.

(b)    The foregoing warranty and conditions shall apply to any new, repaired or replaced Software and Equipment, components, parts and/or Bar Code Products supplied by Paragon.

(c)    Customer's remedies are limited solely to Paragon's obligations to repair or replace, at Paragon's sole discretion, the Software and Equipment, component, part and/or Bar Code Product.

(d)    Customer shall submit in writing any claim against this warranty to Paragon within twelve (12) months from the date of delivery of the Software and Equipment, parts, and/or Bar Code Products to Customer.

2.    **EXCEPT FOR PARAGON'S INDEMNIFICATION OBLIGATIONS, IN NO EVENT SHALL THE AGGREGATE LIABILITY OF EITHER PARTY (INCLUDING LIABILITY TO ANY PERSON OR PERSONS WHOSE CLAIM OR CLAIMS ARE BASED ON OR DERIVED FROM A RIGHT OR RIGHTS CLAIMED BY LICENSEE), WITH RESPECT TO ANY AND ALL CLAIMS AT ANY AND ALL TIMES ARISING FROM OR RELATED TO THE SUBJECT MATTER FOR THIS AGREEMENT, IN CONTRACT, TORT, OR OTHERWISE, EXCEED BEYOND THE TOTAL AMOUNT PAID TO LICENSOR UNDER THIS AGREEMENT AT THE TIME THE LIABILITY IS DETERMINED. NEITHER PARTY SHALL BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES OR FOR THE LOSS OF PROFIT, REVENUE, OR DATA ARISING OUT OF THE SERVICES AND/OR SOFTWARE AND EQUIPMENT, COMPONENTS, PARTS AND/OR BAR-CODE PRODUCTS AND/OR ANY OTHER PORTION OF THIS AGREEMENT.**

3.    **THIS WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OR OTHERWISE.**

4.    This warranty does not apply to any Software, Equipment, components, parts and/or Bar-code Products that have been modified (other than by Paragon), subjected to improper use or operation, installation, or maintenance, repaired or serviced by any person other

Page | 7

than Paragon, or that have not been used or operated in accordance with Paragon's and/or the manufacturer's specifications.

5.    Customer's sole remedies for the breach of any warranties contained in this Agreement shall be limited to the remedies provided in this Agreement. Paragon's liability to Customer for damages of any nature shall not exceed the total charges paid by Customer under this Agreement.

## ARTICLE XII – Confidentiality

1.    As used herein, "Confidential Information" means all confidential and proprietary information of a party ("Disclosing Party") disclosed to the other party ("Receiving Party"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure, including the terms and conditions of this Agreement, the Paragon Technology, Customer information, technology and technical information, product designs, and business processes. Confidential Information shall not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (iii) was independently developed by the Receiving Party without breach of any obligation owed to the Disclosing Party; or (iv) is received from a third party without breach of any obligation owed to the Disclosing Party.

2.    The Receiving Party shall not disclose or use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, except with the Disclosing Party's prior written permission.

3.    Each party agrees to protect the confidentiality of the Confidential Information of the other party in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind, but in no event shall either party exercise less than commercially reasonable care in protecting such Confidential Information.

4.    If the Receiving Party is compelled by law to disclose Confidential Information of the Disclosing Party, it shall provide the Disclosing Party with prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure.

5.    If the Receiving Party discloses or uses (or threatens to disclose or use) any Confidential Information of the Disclosing Party in breach of this Section, the Disclosing Party shall have the right, in addition to any other remedies available to it, to seek injunctive relief to enjoin such acts, it being specifically acknowledged by the parties that any other available remedies are inadequate.

## ARTICLE XIII - NON-SOLICITATION

1.    During the term of this Agreement and three (3) years thereafter, Customer shall not hire any employee, former employee, independent contractor, or subcontractor of Paragon, who had knowledge of the Paragon Technology, for the direct purpose of technical support, programming, enhancements, documentation, coding, etc. for the Clearview system or any of its related systems, such as, Clearview Warning System, Clearview Market Place, Clearview, or for any technical purpose as it relates to filling Cintas Garment Requests through shared storeroom garments. Nothing in this Article XIII shall be deemed to limit Customer's recruiting efforts directed at the general public.

## ARTICLE XIV – Miscellaneous

1.     This Agreement shall be binding on and inure to the benefit of Paragon and Customer and their respective successors. Customer may not assign this Agreement without written consent from Paragon.

2.     Any notices required by this Agreement to be given by one party to the other party shall be made in writing to that party at the address shown at the beginning of this Agreement or at any other address that may be designated in writing from time to time by that party. All notices shall be delivered U.S. Certified Mail or Via Facsimile prepaid, and shall be effective upon the receipt by the party.

3.     This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio. Any suit relating to this Agreement shall be instituted in a state or federal court in Cuyahoga County, Ohio, and the parties to this Agreement hereby waive any dispute over and agree to the venue and personal jurisdiction in such a court.

4.     If any legal action is necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees in addition to any other relief to which that party may be entitled. This provision shall be construed as applicable to the entire Agreement.

5.     This Agreement supersedes any and all agreements, both oral and written, between the parties with respect to the subject matter of this Agreement and contains all of the covenants and agreements between the parties with respect to the subject matter of this Agreement.

6.     If any provision in this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions will nevertheless continue in full force and effect without being impaired or invalidated in any way.

7.     Paragon and Customer agree that no failure to exercise and no delay in exercising any right, power, or privilege under this Agreement on the part of either party shall operate as a waiver of any right, power, or privilege under this Agreement. However, Paragon and Customer expressly agree that the various deadlines for the performance of certain acts provided in this Agreement are mandatory and cannot be waived, unless waived in writing by Paragon and Customer.

**IN WITNESS WHEREOF**, the parties have executed this Agreement this 1st day of May, 2014.

PARAGON DATA SYSTEMS, INC.

By: _Anthony V. Anselmo_

Date: _5-14-14_

Its: Anthony V. Anselmo – Chief Operating Officer

Cintas Corporation

By: _Tu._

Date: _5/27/14_

Its: _PRESIDENT – RENTAL DIVISION_

# Exhibit
# 2

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

PARAGON DATA SYSTEMS, INC.,      )   CASE NO.: CV 22 969925
)
               Plaintiff,   )   JUDGE: MAUREEN CLANCY
)
           vs.      )
)   **PROTECTIVE ORDER**
CINTAS CORPORATION et al.,      )
)
           Defendants.   )
)

A party to this action has moved that the Court enter a protective order. The Court has determined that the terms set forth herein are appropriate to protect the respective interests of the parties, the public, and the Court. Accordingly, it is ORDERED:

1. **Scope.** All documents produced in the course of discovery, including initial disclosures, all responses to discovery requests, all deposition testimony and exhibits, other materials which may be subject to restrictions on disclosure for good cause and information derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Order concerning confidential information as set forth below. As there is a presumption in favor of open and public judicial proceedings in the courts, this Order shall be strictly construed in favor of public disclosure and open proceedings wherever possible. The Order is also subject to the Local Rules of Court of Common Pleas, Cuyahoga County, and the Ohio Rules of Civil Procedure on matters of procedure and calculation of time periods.

2. **Form and Timing of Designation.** A party may designate documents as confidential and restricted in disclosure under this Order by placing or affixing the words "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" on the document in a manner that will not interfere with the legibility of the document and that will permit complete removal of the CONFIDENTIAL -

SUBJECT TO PROTECTIVE ORDER designation. Documents shall be designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER prior to or at the time of the production or disclosure of the documents. When electronically stored information is produced which cannot itself be marked with the designation CONFIDENTIAL, the physical media on which such electronically stored information is produced shall be marked with the applicable designation. The party receiving such electronically stored information shall then be responsible for labeling any copies that it creates thereof, whether electronic or paper, with the applicable designation. By written stipulation the parties may agree temporarily to designate original documents that are produced for inspection CONFIDENTIAL, even though the original documents being produced have not themselves been so labeled. All information learned in the course of such an inspection shall be protected in accordance with the stipulated designation. The copies of documents that are selected for copying during such an inspection shall be marked CONFIDENTIAL, as required under this Order and thereafter the copies shall be subject to protection under this Order in accordance with their designation. The designation "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order.

**3. Documents Which May be Designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER.** Any party may designate documents as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER upon making a good faith determination that the documents contain information protected from disclosure by statute or that should be protected from disclosure as confidential personal information, medical or psychiatric information, trade secrets, personnel records, or such other sensitive commercial information that is not publicly available. Public

records and other information or documents that are publicly available may not be designated as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER.

**4.  Depositions.** Deposition testimony shall be deemed CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER only if designated as such. Such designation shall be specific as to the portions of the transcript or any exhibit to be designated as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER. Thereafter, the deposition transcripts and any of those portions so designated shall be protected as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER, pending objection, under the terms of this Order.

**5.  Protection of Confidential Material.**

**a)**  General Protections. Documents designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER under this Order shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in 5(b) for any purpose whatsoever other than to prepare for and to conduct discovery and trial in this action, including any appeal thereof.

**b)  Limited Third-Party Disclosures.** The parties and counsel for the parties shall not disclose or permit the disclosure of any CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER documents to any third person or entity except as set forth in subparagraphs (1)-(5). Subject to these requirements, the following categories of persons may be allowed to review documents that have been designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER:

**1)  Counsel.** Counsel for the parties and employees and agents of counsel who have responsibility for the preparation and trial of the action;

**2)  Parties.** Parties and employees of a party to this Order;

**3) Court Reporters and Recorders.** Court reporters and recorders engaged for depositions;

**4) Consultants, Investigators and Experts.** Consultants, investigators, or expe1is (hereinafter referred to collectively as "experts") employed by the parties or counsel for the parties to assist in the preparation and trial of this action or proceeding, but only after such persons have completed the ce1iification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound; and

**5) Others by Consent.** Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered. All such persons shall execute the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound.

**c) Control of Documents.** Counsel for the parties shall take reasonable and appropriate measures to prevent unauthorized disclosure of documents designated as CONFIDENTIAL pursuant to the terms of this Order. Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of 1 year after dismissal of the action, the entry of final judgment and/or the conclusion of any appeals arising therefrom.

**d) Copies.** Prior to production to another party, all copies, electronic images, duplicates, extracts, summaries or descriptions (hereinafter referred to collectively as "copies") of documents designated as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER under this Order, or any individual portion of such a document, shall be affixed with the designation "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" if the word does not already appear on the copy. All such copies shall thereafter be entitled to

the protection of this Order. The term "copies" shall not include indices, electronic databases or lists of documents provided these indices, electronic databases or lists do not contain substantial portions or images of the text of confidential documents or otherwise disclose the substance of the confidential information contained in those documents.

**e)**  Inadvertent Production. Inadvertent production of any document or information without a designation of "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" shall be governed by Fed. R. Evid. 502.

**6. Filing of CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER Documents Under Seal.**   Absent a statute or an order of this Court, documents may not be filed under seal. Neither this Stipulated Protective Order nor any other sealing order constitutes blanket authority to file entire documents under seal. Only confidential portions of relevant documents are subject to sealing. To the extent that a brief, memorandum or pleading references any document marked as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER, then the brief, memorandum or pleading shall refer the Court to the particular exhibit filed under seal without disclosing the contents of any confidential information. If, however, the confidential information must be intertwined within the text of the document, a party may timely move the Court for leave to file both a redacted version for the public docket and an unredacted version for sealing.

Absent a court-granted exception based upon extraordinary circumstances, any and all filings made under seal shall be served electronically and filed in paper form under Local Rule 39.0(J)(1). If both redacted and unredacted versions are being submitted for filing, each version shall be clearly named so there is no confusion as to why there are two entries on the docket for the same filing.

A sealed filing shall be placed in a sealed envelope marked "CONFIDENTIAL - SUBJECT

TO PROTECTIVE ORDER." The sealed envelope shall display the case name and number, a designation as to what the document is, the name of the party on whose behalf it is submitted, and the name of the attorney who has filed the sealed document. A copy of this Stipulated Protective Order, or other relevant authorizing order, shall be included in the sealed envelope.

Any and all documents that may have been subject to sealing during discovery or motion practice will not enjoy a protected or confidential designation if the matter comes on for hearing, argument, or trial in the courtroom. The hearing, argument, or trial will be public in all respects.

**7. Challenges by a Party to Designation as Confidential.** Any CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER designation is subject to challenge by any party or non-party with standing to object (hereafter "party"). Before filing any motions or objections to a confidentiality designation with the Court, the objecting party shall have an obligation to meet and confer in a good faith effort to resolve the objection by agreement. If agreement is reached confirming or waiving the CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER designation as to any documents subject to the objection, the designating party shall serve on all parties a notice specifying the documents and the nature of the agreement.

**8. Action by the Court.** Applications to the Court for an order relating to any documents designated CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER shall be by motion under Local Rule and any other procedures set forth in the presiding judge's standing orders or other relevant orders. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make any orders that may be appropriate with respect to the use and disclosure of any documents produced or use in discovery or at trial.

**9. Use of Confidential Documents or Information at Trial.** All trials are open to the

public. Absent order of the Court, there will be no restrictions on the use of any document that may be introduced by any party during the trial. If a party intends to present at trial CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER documents or information derived therefrom, such party shall provide advance notice to the other party at least five (5) days before the commencement of trial by identifying the documents or information at issue as specifically as possible (i.e., by Bates number, page range, deposition transcript lines, etc.) without divulging the actual CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER documents or information. The Court may thereafter make such orders as are necessary to govern the use of such documents or information at trial.

**10. Obligations on Conclusion of Litigation.**

**a) Order Remains in Effect.** Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

**b) Return of CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER Documents.** Within thirty days after dismissal or entry of **final** judgment not subject to further appeal, all documents treated as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER under this Order, including copies as defined in ¶ 5(d), shall be returned to the producing party unless: (1) the document has been offered into evidence or filed without restriction as to disclosure; (2) the parties agree to destruction in lieu of return; or (3) as to documents bearing the notations, summations, or other mental impressions of the receiving party, that party elects to destroy the documents and certifies to the producing party that it has done so. Notwithstanding the above requirements to return or destroy documents, counsel may retain attorney work product, including an index which refers or relates to information designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER, so

long as that work product does not duplicate verbatim substantial portions of the text or images of confidential documents. This work product shall continue to be CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER under this Order. An attorney may use his or her work product in a subsequent litigation provided that its use does not disclose or use CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER documents.

    **c)  Return of Documents Filed under Seal.** After dismissal or entry of final judgment not subject to further appeal, the Clerk may elect to return to counsel for the parties or, after notice, destroy documents filed or offered at trial under seal or otherwise restricted by the Court as to disclosure.

**11. Order Subject to Modification.** This Order shall be subject to modification by the Court on its own motion or on motion of a party or any other person with standing concerning the subject matter. Motions to modify this Order shall be served and filed under Local Rule and the presiding judge's standing orders or other relevant orders.

**12. No Prior Judicial Determination.** This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any documents or information designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER by counsel or the parties is subject to protection under Rule 26 of the Ohio Rules of Civil Procedure or otherwise until such time as the Court may rule on a specific document or issue.

**13. Persons Bound.** This Order shall take effect when entered and shall be binding upon all counsel and their law firms, the parties, and persons made subject to this Order by its terms.

**It is SO ORDERED.**

Dated:

_____
Judge Maureen Clancy

**ATTACHMENT A**

.IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| PARAGON DATA SYSTEMS, INC., | ) | CASE NO.:  CV 22 969925 |
| | ) | |
| Plaintiff, | ) | JUDGE:  MAUREEN CLANCY |
| | ) | |
| vs. | ) | |
| | ) | **ACKNOWLEDGEMENT AND** |
| CINTAS CORPORATION et al., | ) | **AGREEMENT TO BE BOUND** |
| | ) | |
| Defendants. | ) | |
| | ) | |

The undersigned hereby acknowledges that he/she has read the Protective Order dated

_____ in the above-captioned action and attached hereto, understands the terms

thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the

Cuyahoga County Court of Common Pleas of Ohio in matters relating to the Protective Order

and understands that the terms of the Protective Order obligate him/her to use documents

designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER in accordance with the

Order solely for the purposes of the above-captioned action, and not to disclose any such

documents or information derived directly therefrom to any other person, firm or concern.

The undersigned acknowledges that violation of the Protective Order may result in

penalties for contempt of court.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

_____

_____

Date:_____  _____
Signature

{10757116: }

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true copy of the foregoing PLAINTIFFS' MOTION TO SUBSTITUTE REDACTED COMPLAINT AND FILE ORIGINAL UNDER SEAL was filed electronically this 2nd day of November 2022.  Notice of this filing will be sent to all parties registered for electronic filing by operation of the Court's electronic filing system.

In addition, a copy of the Motion was sent by U.S. mail, postage prepaid, to the following defendants, and via email to their counsel (if known):

CINTAS CORPORATION
3366 Riverside Drive
Suite 103
Upper Arlington, Ohio 43221
wminor@kmklaw.com

SAP AMERICA, INC.
1209 Orange St.
Wilmington, DE 19801
trgoots@jonesday.com

ACSIS, INC.
251 Little Falls Drive
Wilmington, DE 1980
Michael.hall@bipc.com

GARY TICE
8153 Jordan Valley Court
Cleves, OH 45002

WADE WILLIAMS
5750 McNeven Court
Dublin, OH 43017

GREG BOVA
7597 Herrick Park Drive
Hudson, OH 44236

BEN SCHNEIDER
215 Mulberry Court
Fort Thomas, KY 41071


                           s/ Matthew J. Cavanagh
                           *Counsel for Plaintiff*

**TAB B**

# JONES DAY

NORTH POINT  •  901 LAKESIDE AVENUE  •  CLEVELAND, OHIO 44114.1190

TELEPHONE: +1.216.586.3939  •  JONESDAY.COM

DIRECT NUMBER:  2165867011
TRGOOTS@JONESDAY.COM

JP789560
530198.645010

October 24, 2022

***Via email and regular U.S. Mail***
awuliger@wuligerlaw.com

Amy A. Wuliger
Wuliger & Wuliger
2003 St. Clair Ave.
Cleveland, OH 44114

> Re:   Complaint Filed in *Paragon Data Systems, Inc. v. Cintas Corporation, et al.*,
>       Cuyahoga County Common Pleas, Case No. CV 22 969925

Dear Ms. Wuliger:

My firm represents SAP America.  Thank you for forwarding earlier today a courtesy copy of the Complaint that you filed on behalf of Paragon Data Systems, Inc. in the Court of Common Pleas Cuyahoga County, Case No. CV 22 969925.  It is apparent from reading that Complaint that much of the information you used in making the allegations set forth therein was derived from Confidential Information produced in the prior litigation between the parties, Case No. 1:20-cv-01883-DAP, in United States District Court for the Northern District of Ohio ("the Prior Litigation").

Attached is a copy of the Protective Order entered by Judge Polster in the Prior Litigation.  As discussed below, the Complaint you filed violates that Protective Order in multiple ways and must be immediately withdrawn.

As an initial matter, the Scope of the Protective Order, as set forth in paragraph 1, applies to "all documents" produced in the Prior Litigation, including "**information derived directly therefrom**."  As set forth in examples below, it is clear that you used information derived from Confidential Information as the basis for the allegations in the Complaint.  Moreover, you used the information in a publicly filed document to support your unfounded allegations and to baselessly criticize my client.

Pursuant to the Protective Order, the Confidential Information produced in the Prior Litigation could only be used for discovery and trial in **that** action.  You have used them to file a new case, adding parties and dropping claims.  Parties, which I note, you could have only had knowledge of from Confidential Information produced by one of the parties in the Prior Litigation.

AMSTERDAM  •  ATLANTA  •  BEIJING  •  BOSTON  •  BRISBANE  •  BRUSSELS  •  CHICAGO  •  CLEVELAND  •  COLUMBUS  •  DALLAS  •  DETROIT
DUBAI  •  DÜSSELDORF  •  FRANKFURT  •  HONG KONG  •  HOUSTON  •  IRVINE  •  LONDON  •  LOS ANGELES  •  MADRID  •  MELBOURNE
MEXICO CITY  •  MIAMI  •  MILAN  •  MINNEAPOLIS  •  MUNICH  •  NEW YORK  •  PARIS  •  PERTH  •  PITTSBURGH  •  SAN DIEGO  •  SAN FRANCISCO
SÃO PAULO  •  SAUDI ARABIA  •  SHANGHAI  •  SILICON VALLEY  •  SINGAPORE  •  SYDNEY  •  TAIPEI  •  TOKYO  •  WASHINGTON

JONES DAY

Amy A. Wuliger
October 24, 2022
Page 2

Additionally, pursuant to paragraph 5(b)(1), disclosure of Confidential Information is limited to "Counsel for the parties and employees and agents of counsel **who have responsibility for the preparation and trial of the action**." Neither you, nor anyone at your firm or McDonald Hopkins, were attorneys of record in that matter. Accordingly, you should not have access to the Confidential Information produced by the parties.

Your client agreed to the terms of that Protective Order. Indeed, it argued to reduce the protections provided thereunder, by allowing Paragon employees to have access to SAP's Confidential Information. Now, after making those arguments, your client provided you with those documents, in violation of the Protective Order. You could have appeared as counsel of record in the Prior Litigation and refiled the suit before Judge Polster, in which case you would have been counsel of record and allowed to have access to the documents. Instead, you chose to avoid Judge Polster and file a new action in Common Pleas.

Below is a non-exhaustive list of the paragraphs in the Complaint that include information derived from Confidential Information produced by a party in the Prior Litigation.

- Paragraph 4 – names of Cintas employees that allegedly shared passwords and login information.
- Paragraph 17 – information about SAP's work for Cintas in 2008.
- Paragraph 20 – allegations about an alleged failure of SAP to perform and dismissal of a Cintas CIO.
- Paragraphs 66-69 – information about "secret" discussions between SAP and Cintas and the relationship between the companies.
- Paragraphs 72-73 – allegations about SAP's capabilities and the retention of ACSIS.
- Paragraphs 83-84 – information regarding the roles of specific Cintas employees.
- Paragraphs 91-94 – information about alleged wrongful activity by Cintas employees.
- Paragraph 97 – information about testing by the parties.

Be advised that SAP reserves its rights to raise this issue with Judge Polster and with Judge Clancy, and to seek appropriate sanctions and/or move for contempt.

JONES DAY

Amy A. Wuliger
October 24, 2022
Page 3

Please confirm immediately that you will withdraw the Complaint and take all actions necessary to remove all of my client's Confidential Information from public disclosure.

Very truly yours,

Thomas R. Goots

Thomas R. Goots

Attachment

cc:     David B. Cupar, Esq. (w/attachment)
        dcupar@mcdonaldhopkins.com

        Nicholas B. Clifford, Esq. (w/attachment)
        Nicholas.Clifford@tuckerellis.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

**Paragon Data Systems, Inc.**              )        **Case No. 1:20cv1883**
            Plaintiff                        )
                                             )
v.                                           )              PROTECTIVE ORDER
                                             )
**Cintas Corporation, et al.,**              )
            Defendant                        )

A party to this action has moved that the Court enter a protective order.  The Court has

determined that the terms set forth herein are appropriate to protect the respective interests of

the parties, the public, and the Court.  Accordingly, it is ORDERED:

**1. Scope.**  All documents produced in the course of discovery, including initial

disclosures, all responses to discovery requests, all deposition testimony and exhibits, other

materials which may be subject to restrictions on disclosure for good cause and information

derived directly therefrom (hereinafter collectively "documents"), shall be subject to this Order

concerning confidential information as set forth below.  As there is a presumption in favor of

open and public judicial proceedings in the federal courts, this Order shall be strictly construed

1

in favor of public disclosure and open proceedings wherever possible. The Order is also subject to the Local Rules of this District and the Federal Rules of Civil Procedure on matters of procedure and calculation of time periods.

2. **Form and Timing of Designation.** A party may designate documents as confidential and restricted in disclosure under this Order by placing or affixing the words "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" on the document in a manner that will not interfere with the legibility of the document and that will permit complete removal of the CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER designation. Documents shall be designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER prior to or at the time of the production or disclosure of the documents. When electronically stored information is produced which cannot itself be marked with the designation CONFIDENTIAL, the physical media on which such electronically stored information is produced shall be marked with the applicable designation. The party receiving such electronically stored information shall then be responsible for labeling any copies that it creates thereof, whether electronic or paper, with the applicable designation. By written stipulation the parties may agree temporarily to designate original documents that are produced for inspection CONFIDENTIAL, even though the original documents being produced have not themselves been so labeled. All information learned in the course of such an inspection shall be protected in accordance with the stipulated designation. The copies of documents that are selected for copying during such an inspection shall be marked CONFIDENTIAL, as required under this Order and thereafter the copies shall be subject to protection under this Order in accordance with their designation. The designation "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" does not mean that the document

2

has any status or protection by statute or otherwise except to the extent and for the purposes of this Order.

**3. Documents Which May be Designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER.** Any party may designate documents as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER upon making a good faith determination that the documents contain information protected from disclosure by statute or that should be protected from disclosure as confidential personal information, medical or psychiatric information, trade secrets, personnel records, or such other sensitive commercial information that is not publicly available. Public records and other information or documents that are publicly available may not be designated as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER.

**4. Depositions.** Deposition testimony shall be deemed CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER only if designated as such. Such designation shall be specific as to the portions of the transcript or any exhibit to be designated as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER. Thereafter, the deposition transcripts and any of those portions so designated shall be protected as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER, pending objection, under the terms of this Order.

**5. Protection of Confidential Material.**

    **(a) General Protections.** Documents designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER under this Order shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in ¶ 5(b) for any purpose whatsoever other than to prepare for and to conduct discovery and trial in this action [adversary proceeding], including any appeal thereof.

3

**(b)    Limited Third-Party Disclosures.**  The parties and counsel for the parties shall not disclose or permit the disclosure of any CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER documents to any third person or entity except as set forth in subparagraphs (1)-(5).  Subject to these requirements, the following categories of persons may be allowed to review documents that have been designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER:

**(1)    Counsel.**  Counsel for the parties and employees and agents of counsel who have responsibility for the preparation and trial of the action;

**(2)    Parties.**  Parties and employees of a party to this Order.

**(3)    Court Reporters and Recorders.**  Court reporters and recorders engaged for depositions;

**(4)    Consultants, Investigators and Experts.**  Consultants, investigators, or experts (hereinafter referred to collectively as "experts") employed by the parties or counsel for the parties to assist in the preparation and trial of this action or proceeding, but only after such persons have completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound; and

**(5)    Others by Consent.**  Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be

4

agreed or ordered.  All such persons shall execute the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound.

**(c)  Control of Documents.**  Counsel for the parties shall take reasonable and appropriate measures to prevent unauthorized disclosure of documents designated as CONFIDENTIAL pursuant to the terms of this Order.  Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of 1 year after dismissal of the action, the entry of final judgment and/or the conclusion of any appeals arising therefrom.

**(d)  Copies.**  Prior to production to another party, all copies, electronic images, duplicates, extracts, summaries or descriptions (hereinafter referred to collectively as "copies") of documents designated as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER under this Order, or any individual portion of such a document, shall be affixed with the designation "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" if the word does not already appear on the copy.  All such copies shall thereafter be entitled to the protection of this Order.  The term "copies" shall not include indices, electronic databases or lists of documents provided these indices, electronic databases or lists do not contain substantial portions or images of the text of confidential documents or otherwise disclose the substance of the confidential information contained in those documents.

**(e)  Inadvertent Production.**  Inadvertent production of any document or information without a designation of "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" shall be governed by Fed. R. Evid. 502.

5

**6.  Filing of CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER Documents**

**Under Seal.**    Absent a statute or an order of this Court, documents may not be filed under seal.

*See* L.R.5.2; Electronic Filing Policies and Procedures Manual Section 16.  Neither this

Stipulated Protective Order nor any other sealing order constitutes blanket authority to file entire

documents under seal.  Only confidential portions of relevant documents are subject to sealing.

To the extent that a brief, memorandum or pleading references any document marked as

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER, then the brief, memorandum or

pleading shall refer the Court to the particular exhibit filed under seal without disclosing the

contents of any confidential information.  If, however, the confidential information must be

intertwined within the text of the document, a party may timely move the Court for leave to file

both a redacted version for the public docket and an unredacted version for sealing.

Absent a court-granted exception based upon extraordinary circumstances, any and all

filings made under seal shall be submitted electronically and shall be linked to this Stipulated

Protective Order or other relevant authorizing order.  If both redacted and unredacted versions

are being submitted for filing, each version shall be clearly named so there is no confusion as to

why there are two entries on the docket for the same filing.

If the Court has granted an exception to electronic filing, a sealed filing shall be placed in

a sealed envelope marked "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER."  The

sealed envelope shall display the case name and number, a designation as to what the document

is, the name of the party on whose behalf it is submitted, and the name of the attorney who has

filed the sealed document.  A copy of this Stipulated Protective Order, or other relevant

authorizing order, shall be included in the sealed envelope.

6

Any and all documents that may have been subject to sealing during discovery or motion practice will not enjoy a protected or confidential designation if the matter comes on for hearing, argument, or trial in the courtroom. The hearing, argument, or trial will be public in all respects.

7. **Challenges by a Party to Designation as Confidential.** Any CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER designation is subject to challenge by any party or non-party with standing to object (hereafter "party"). Before filing any motions or objections to a confidentiality designation with the Court, the objecting party shall have an obligation to meet and confer in a good faith effort to resolve the objection by agreement. If agreement is reached confirming or waiving the CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER designation as to any documents subject to the objection, the designating party shall serve on all parties a notice specifying the documents and the nature of the agreement.

8. **Action by the Court.** Applications to the Court for an order relating to any documents designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER shall be by motion under Local Rule 7.1 and any other procedures set forth in the presiding judge's standing orders or other relevant orders. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make any orders that may be appropriate with respect to the use and disclosure of any documents produced or use in discovery or at trial.

9. **Use of Confidential Documents or Information at Trial.** All trials are open to the public.

Absent order of the Court, there will be no restrictions on the use of any document that

7

may be introduced by any party during the trial. If a party intends to present at trial CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER documents or information derived therefrom, such party shall provide advance notice to the other party at least five (5) days before the commencement of trial by identifying the documents or information at issue as specifically as possible (i.e., by Bates number, page range, deposition transcript lines, etc.) without divulging the actual CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER documents or information. The Court may thereafter make such orders as are necessary to govern the use of such documents or information at trial.

**10. Obligations on Conclusion of Litigation.**

    **(a) Order Remains in Effect.** Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

    **(b) Return of CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER Documents.** Within thirty days after dismissal or entry of final judgment not subject to further appeal, all documents treated as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER under this Order, including copies as defined in ¶ 5(d), shall be returned to the producing party unless: (1) the document has been offered into evidence or filed without restriction as to disclosure; (2) the parties agree to destruction in lieu of return; or (3) as to documents bearing the notations, summations, or other mental impressions of the receiving party, that party elects to destroy the documents and certifies to the producing party that it has done so. Notwithstanding the above requirements to return or destroy documents, counsel may retain attorney work product, including an index which refers or relates to

8

information designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER,

so long as that work product does not duplicate verbatim substantial portions of the

text or images of confidential documents. This work product shall continue to be

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER under this Order. An

attorney may use his or her work product in a subsequent litigation provided that its

use does not disclose or use CONFIDENTIAL - SUBJECT TO PROTECTIVE

ORDER documents.

(c)  **Return of Documents Filed under Seal.** After dismissal or entry of

final judgment not subject to further appeal, the Clerk may elect to return to counsel

for the parties or, after notice, destroy documents filed or offered at trial under seal or

otherwise restricted by the Court as to disclosure.

**11. Order Subject to Modification.** This Order shall be subject to modification by the

Court on its own motion or on motion of a party or any other person with standing concerning

the subject matter. Motions to modify this Order shall be served and filed under Local Rule 7.1

and the presiding judge's standing orders or other relevant orders.

**12. No Prior Judicial Determination.** This Order is entered based on the

representations and agreements of the parties and for the purpose of facilitating discovery.

Nothing herein shall be construed or presented as a judicial determination that any documents or

information designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER by counsel

or the parties is subject to protection under Rule 26(c) of the Federal Rules of Civil Procedure or

otherwise until such time as the Court may rule on a specific document or issue.

**13. Persons Bound.** This Order shall take effect when entered and shall be binding upon all counsel and their law firms, the parties, and persons made subject to this Order by its terms.

**It is SO ORDERED.**

Dated: 10/13/2020          s/Dan Aaron Polster
                          U.S. District Judge

10

## FORM PROTECTIVE ORDER
## ATTACHMENT A

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) | Civil No. |
| Plaintiff | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| Defendant | ) |  |

## ACKNOWLEDGMENT
## AND
## AGREEMENT TO BE BOUND

The undersigned hereby acknowledges that he/she has read the Protective Order dated

_____ in the above-captioned action and attached hereto, understands the terms

thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the

United States District Court for the Northern District of Ohio in matters relating to the Protective

Order and understands that the terms of the Protective Order obligate him/her to use documents

designated CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER in accordance with the

Order solely for the purposes of the above-captioned action, and not to disclose any such

documents or information derived directly therefrom to any other person, firm or concern.

1

The undersigned acknowledges that violation of the Protective Order may result in

penalties for contempt of court.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

_____

_____


Date:_____    _____
                    Signature

2

**TAB C**

**From:** Cupar, David B. <dcupar@mcdonaldhopkins.com>
**Sent:** Thursday, October 27, 2022 3:12 PM
**To:** Boccardi, Antonietta <aboccardi@JonesDay.com>; awuliger@wuligerlaw.com
**Cc:** nicholas.clifford@tuckerellis.com; Goots, Thomas R. <trgoots@JonesDay.com>; Beauchamp, Joe <jbeauchamp@JonesDay.com>
**Subject:** RE: Complaint Filed in Paragon Data Systems, Inc. v. Cintas Corporation, et al.

** External mail **

Tom,

Hope you are well. We received your October 24, 2022 letter. We agree that the Protective Order states that Confidential Information is accessible to "[c]ounsel for the parties and employees and agents of counsel who have responsibility for the preparation and trial of the action." You misinterpret this language to means that only "attorneys of record" can have access to such Confidential Information. That's not what this cited language says. Because Ms. Wuliger and our firm fall within that language of the Protective Order, we are in compliance and had every right to review that Confidential Information.

We agree with you that there is no Confidential Information disclosed in the complaint and your letter does not make any such accusation. The mere fact that a few allegations the complaint may have been "derived from Confidential Information", as you put it, does not mean Paragon disclosed Confidential Information in the Complaint.

For these reasons, your Draconian solution of dismissing an entire complaint or "reserve its rights… to seek appropriate sanctions" is unwarranted.

In any event, there is a simple solution to this situation. First, we'll move to file the paragraphs identified in your letter under seal. Second, let us know if you'll stipulate to Judge Polster's Protective Order for entry into the current case. This will resolve this matter simply and completely. Let me know if you agree to this approach.

Best,
Dave

**David B. Cupar**
Member

T: 216.430.2036                     600 Superior Avenue East
F: 216.348.5474                      Suite 2100
dcupar@mcdonaldhopkins.com          Cleveland, OH 44114
www.mcdonaldhopkins.com



---

**From:** Boccardi, Antonietta <aboccardi@JonesDay.com>
**Sent:** Monday, October 24, 2022 4:40 PM
**To:** awuliger@wuligerlaw.com
**Cc:** Cupar, David B. <dcupar@mcdonaldhopkins.com>; nicholas.clifford@tuckerellis.com; Goots, Thomas R. <trgoots@JonesDay.com>; Beauchamp, Joe <jbeauchamp@JonesDay.com>
**Subject:** [External] Complaint Filed in Paragon Data Systems, Inc. v. Cintas Corporation, et al.

Ms. Wuliger –

Please see attached letter from Tom Goots.

Thank you.

Antonietta Boccardi
Assistant to Thomas R. Goots
**JONES DAY® - One Firm Worldwide℠**
901 Lakeside Avenue
Cleveland, Ohio  44114-1190
Office +1.216.586.7495
aboccardi@jonesday.com

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***